No. 58,387

STATE OF KANSAS, *Appellee*, v. CHARLES F. STRAUCH, *Appellant*.

(718 P.2d 613)

Opinion filed May 2, 1986.

*Ronald E. Wurtz,* of Topeka, argued the cause and was on the brief for the appellant.

*Gene M. Olander,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: Charles F. Strauch, the defendant-appellant, was convicted by a Shawnee County, Kansas, jury of premeditated first-degree murder (K.S.A. 21-3401) and aggravated criminal sodomy (K.S.A. 1985 Supp. 21-3506[c]). The defendant raises the following issues on appeal: his confession was improperly admitted into evidence, a mistrial should have been granted due to prosecutorial misconduct, certain expert testimony was inadmissible, his motion for judgment of acquittal on the aggravated criminal sodomy charge should have been granted, instructions

on the lesser included offenses of felony murder should have been given, and his sentence was excessive.

On Sunday, October 21, 1984, the body of a partially nude female was found lying face down in a pond southeast of Topeka, Kansas. Various items of clothing were found scattered at the scene of the crime: a pair of black slacks torn in half, a white sweater, bra, earrings, and one shoe. The victim was later identified as Lilly Ledford. The findings of the autopsy performed by Dr. David Borel revealed the victim had received serious skull fractures, chest fractures, and had been stabbed. In addition to an extensive list of other injuries were injuries to the lining of her rectum, which indicated penetration by a foreign object of up to eight and a half inches. Abrasions on the victim's back indicated she had been dragged on the ground to the pond.

On Sunday, October 21, 1984, the same day the body was discovered, the police talked to Mr. and Mrs. Roger Maack, who lived in the area where the body was found. Mr. and Mrs. Maack were driving home on Saturday, October 20, 1984, at approximately 9:30 p.m. They saw a white Chevrolet pickup, with its lights off, setting on the east side of the road near the location of the pond. When they were about two car lengths away from the pickup, a man jumped out from the trees, crossed the ditch, and opened the hood of the pickup. Mrs. Maack described the man as 5'10"-5'11", weighing 200 pounds, and wearing a tan or wheat-colored jacket and blue jeans. Mr. Maack described the man as partially bald, heavy-set, and wearing a tan coat and blue jeans. At trial, Mr. Maack identified the defendant as the man he saw that night.

On Monday, October 22, 1984, the police had obtained the following information. Teresa Huske and the victim had gone to the Venetian Club together Saturday night, October 20, 1984. When Ms. Huske left the club, at approximately 6:40 p.m., the victim was talking to Charlie Strauch. A bartender at the Venetian Club, Shirley Calvert-Emery, left the club at approximately 8:30 p.m. the same night. At that time, the victim and the defendant were still there. The victim wanted a ride to Charlie Hall's but turned down Ms. Calvert-Emery's offer to take her there. The defendant's address was listed on his membership card to the Venetian Club. A white pickup was seen in the driveway at that address. Reta Johnson, the defendant's girl-

friend, and the defendant lived together at that address. The police talked to Reta Johnson.

The defendant was arrested at approximately 5:30 p.m., as he was getting off work, on Monday, October 22, 1984. He was read the *Miranda* warning at the time of his arrest and again prior to his interrogation. Following the warning, the defendant confessed to the murder of Lilly Ledford. The facts surrounding the defendant's interrogation at the time of his confession will be discussed later. In his confession, the defendant stated he drove Reta's truck to the Venetian Club on Saturday. A woman wearing a white sweater and slacks asked him if he was going to Charlie Hall's, and he said yes. They drove to Charlie Hall's and no one was there. The defendant turned back toward Topeka, and stated he ran out of gas. The woman was playing with the defendant's penis, but he said he had been drinking and was impotent. The woman told him he wasn't a man, but a little boy. They started fighting back and forth in the truck—he grabbed her feet and pulled her out of the truck, tearing off her slacks. The woman had something shiny in her hand and started hitting him. He then hit her with a roofing hatchet. Then the defendant walked up a gravel road, but found it was a dead-end and returned to the truck. There he found the victim was lying under a tree making gurgling sounds. The defendant kicked her and got the roofing hatchet from the truck. During their struggle he remembered kicking her and hitting her several times with the roofing hatchet. He dragged her down to the pond by her feet, on her back, and "flung" her around by the feet into the water. The defendant then walked to a Derby gas station and called Reta. She picked him up at the Derby station and they got home after midnight. Reta washed his clothes—a brown coat, brown corduroys and black T-shirt. The defendant washed the blood off the roofing hatchet. On Sunday, the defendant changed the tires and the bed of the truck. The defendant and Reta disposed of his boots and the roofing hatchet at a dump. They threw his clothes and the victim's purse from a bridge into a river. The police later recovered those items.

At trial, another bartender at the Venetian Club, Michael J. Kisner, testified he saw the victim and the defendant leave the club together at approximately 9:00 p.m. Loretta Miller, the assistant manager of the Derby station, testified that on October 20, 1984, at approximately 11:00 p.m. a man used the pay phone

at the station. He came to the station on foot, was very muddy, and had blood on his face and on the side of his pants. Ms. Miller called the sheriff's department. Officers arrived at the station and talked to the defendant, who cooperated fully. He said his truck ran out of gas and his wife had come to pick him up. The sheriff's deputy saw no blood on the defendant, but the defendant was soaked to the bone. Daniel Bailey testified that Reta Johnson had called him three times on Sunday and wanted him to pick up a spare bed to their pickup. Bailey picked up the spare bed on Monday, and that same day officers came and got it from him. Paul Vinsonhaler, Reta Johnson's son, testified that on Sunday morning his mother had asked him to take the bed off the truck and change the tires. Paul Crispin, a friend of Vinsonhaler's, testified that early Sunday morning Reta asked them to take a bag and dump it. He didn't know what items were in the bag. He testified Vinsonhaler threw the bag from a bridge.

The defendant was charged with premeditated first-degree murder and in the alternative felony murder, with the underlying felony being aggravated criminal sodomy. The defendant was also charged with aggravated criminal sodomy. The jury convicted him of premeditated first-degree murder and aggravated criminal sodomy. The defendant was sentenced to life for the conviction of first-degree murder, and fifteen years to life for the conviction of aggravated criminal sodomy. The sentences are to run consecutively.

The defendant argues the trial court erred in not suppressing his confession. Prior to trial, a hearing was held on defendant's motion to suppress the confession pursuant to K.S.A. 22-3215. The defendant asserted six specific grounds in his motion: (1) He was not properly advised of the *Miranda* warnings; (2) the statement was not voluntary but the result of mental duress and threats; (3) the statement was obtained by trick promises and false pretenses; (4) the statement was the fruit of an illegal arrest; (5) the defendant did not voluntarily waive his right to counsel; and (6) the violation of various constitutional rights.

The defendant first challenges the trial court's ruling the statement was not the fruit of an illegal arrest. The defendant argues that at the hearing on the motion to suppress, the State failed miserably to establish there was sufficient information constituting probable cause to arrest the defendant without a

warrant. The State argues that although the evidence presented at the hearing was conclusory in nature, the evidence presented at trial clearly showed what information the police had obtained prior to defendant's arrest and that information was sufficient to establish probable cause to arrest the defendant without a warrant.

If a warrantless arrest is challenged by a defendant, the burden is on the State to justify the arrest was not only authorized by the statute, but that it was permissible under the Fourth Amendment to the United States Constitution. The constitutional validity of a warrantless arrest depends upon whether the arresting officer had probable cause to believe that the person arrested had committed a felony. *State v. Clark*, 218 Kan. 726, 730-31, 544 P.2d 1372, *cert. denied* 426 U.S. 939 (1976); K.S.A. 1985 Supp. 22-2401(c)(1). When the admissibility of a confession is in issue, the burden is on the State to establish its admissibility. K.S.A. 22-3215(4).

The issue of probable cause to arrest without a warrant was recently addressed in *State v. Peterson*, 236 Kan. 821, 826-27, 696 P.2d 387 (1985), as follows:

"Probable cause to arrest without a warrant simply means a knowledge of facts and circumstances sufficient for a prudent person to believe a suspect is committing or has committed an offense. Its existence must be determined by practical considerations of everyday life on which a reasonable person acts and not on the hindsight of legal technicians.

"It is well established that where a law enforcement officer arrests with a warrant the collective information of the police officers and law enforcement officers involved in obtaining the warrant forms the basis for the probable cause for the arrest with the warrant, even though that information is not within the knowledge of the arresting officer. In addition, an officer without a warrant, who has sufficient personal knowledge or collective information from other law enforcement officers to form the basis for probable cause, can request a second officer who has come in contact with the suspect to arrest the suspect under proper circumstances.

"The knowledge of the arresting officer is relevant only where an arrest is predicated on that officer's personal observations and information concerning the criminal act. The correct test is whether a warrant if sought could have been obtained by the arresting officer. In a cooperative investigation by many law enforcement officers, the knowledge of one officer is the knowledge of all in determining probable cause for an arrest, provided there has been communication between the individual officers."

Detective Gilchrist testified at the hearing on the defendant's suppression motion that, at the time of the defendant's arrest, he

had information which constituted probable cause to arrest the defendant for the murder of Lilly Ledford. Detective Gilchrist was never asked to state generally what that information was. While the testimony of Detective Gilchrist was conclusory, Arthur Weiss, assistant district attorney, also testified on the issue of probable cause. He stated the investigators had received *information and leads identifying the defendant as the principal suspect,* they had a *picture of the defendant* provided by a *witness,* they knew to look for a pickup carrying roofing equipment because they also knew the defendant was employed by a roofing company.

In determining whether probable cause to arrest exists, all the information in the officer's possession, fair inferences therefrom, and facts may be taken into consideration that might not be admissible on the issue of guilt. *State v. Curtis,* 217 Kan. 717, 723, 538 P.2d 1383 (1975). The State need not produce its entire case in order to establish probable cause. It is not necessary that the evidence giving rise to probable cause be sufficient to prove guilt beyond a reasonable doubt.

Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). In dealing with probable cause, as the name implies, we are not dealing with technicalities, but with probabilities. *Illinois v. Gates,* 462 U.S. 213, 241, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); *Brinegar v. United States,* 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302, *reh. denied* 338 U.S. 839 (1949).

We find a prudent person, possessing knowledge of the above information testified to by Arthur Weiss, and drawing reasonable inferences therefrom, could believe the defendant had committed the crime of murder. Furthermore, as the State points out, the evidence presented at trial more specifically identifies what leads and information the police possessed at the time the defendant was arrested.

The defendant cites authority that where a confession is made while the defendant is under illegal arrest, the court must determine whether the statement was voluntary in order to satisfy the Fifth Amendment of the U.S. Constitution, and whether the statement was sufficiently an act of free will to purge the primary

taint of the illegal arrest to satisfy the Fourth Amendment of the U.S. Constitution. *Taylor v. Alabama*, 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982); *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975); *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Having determined the defendant's confession was not the result of an illegal arrest, we need not address this issue.

The defendant contends his confession was obtained through mental duress, threats, tricks, false promises and false pretenses by the police officers. The various improprieties alleged by the defendant include use of the interrogation technique called the "Mutt and Jeff" or "good guy-bad guy" technique, lies Detective Gilchrist told the defendant about information obtained from the defendant's girlfriend, the raised voice of Detective Gilchrist during the interrogation, and failure of the police to relieve the defendant's discomfort caused by the handcuffs when the defendant was being taken to police headquarters after his arrest. The State merely argues there is no evidence to support the defendant's arguments.

The defendant's girlfriend, Reta Johnson, arrived at police headquarters for questioning around 5:00 or 5:30 p.m. on Monday, October 22, 1984. The same day, the defendant was arrested and arrived at police headquarters for questioning at approximately 6:05 p.m. The defendant was advised of his rights at the time of his arrest and at 6:15 p.m., prior to the interrogation, the defendant waived his rights and agreed to talk. Detective Gilchrist began the questioning by obtaining background information and left the defendant's interrogation room after fifteen-twenty minutes. Detective Gilchrist then went back and forth between the ongoing interrogations of the defendant and Reta Johnson. At various times, he would tell the defendant what Reta had told the police. Detective Gilchrist admitted he lied to the defendant, telling him he had more information than he really did. Initially, the defendant denied knowing anything about the homicide, saying that he had blacked out. Detective Gilchrist told the defendant he believed he was lying and possibly raised his voice at the defendant. The defendant went to the bathroom several times. At 8:00 p.m., the defendant was again escorted to the bathroom and upon his return, stated he was ready to give a

statement. The defendant gave a statement and was then booked into jail at approximately 10:00 p.m. The defendant had worked a full day on October 22, 1984, and did not appear to be under the influence of drugs or alcohol. He was provided food, drinks, and cigarettes during the questioning.

The issue of the voluntariness of confessions was recently addressed in *State v. Waugh*, 238 Kan. 537, 712 P.2d 1243 (1986), where this court stated:

"The U.S. Constitution, under the Fifth Amendment, guarantees the accused the privilege against self-incrimination from statements that are not freely and voluntarily given or are given under the threat of force or compulsion. Procedural safeguards protect the exercise of the privilege against self-incrimination from the coercive effects of custodial interrogation. Prior to custodial interrogation, law enforcement officers must advise a suspect that he has the right to remain silent, that his statements may be used against him at trial, and that if he cannot afford an attorney one will be appointed to represent him. If the suspect indicates in any manner either prior to or during questioning that he wishes to remain silent, interrogation must cease and may not recommence until the suspect knowingly, intelligently and voluntarily waives his right to silence. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

"K.S.A. 22-3215(4) places the burden of proving that a confession or admission is admissible on the prosecution. In the present case, the trial court, after a hearing, determined Waugh's confessions were voluntary. When a trial court determines at a hearing that a defendant's extrajudicial statement was freely, voluntarily and intelligently given and admits the statement into evidence at trial, the appellate court will not reverse such determination if it is supported by substantial competent evidence. *State v. Lilley*, 231 Kan. 694, Syl. ¶ 6, 647 P.2d 1323 (1982).

"When determining the voluntariness of a confession, one views the totality of the circumstances, including: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981).

"Under the Fourteenth Amendment due process voluntariness test, a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. *State v. Soverns*, 215 Kan. 775, 777, 529 P.2d 181 (1974)" 238 Kan. at 540-41.

There, the defendant was charged with first-degree murder. During the interrogation the police encouraged Waugh to tell the truth, but made no positive promise of a benefit. Waugh was also

told he was lying. The police went so far as to tell Waugh they wanted to find the body of the victim so he could receive a Christian burial. When a polygraph test taken by the defendant showed he had previously been lying, he admitted he had killed the victim. Waugh was not allowed to see his wife until he showed the police where the body was located. The defendant's confession was held to be voluntary and not coerced under the totality of the circumstances.

Even if we consider the raised voice of Detective Gilchrist as a threat, in evaluating any threatening or intimidating remarks made by the police, the question is whether the defendant's will was overborne at the time he confessed. *Lynumn v. Illinois*, 372 U.S. 528, 534, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963). There must be a connection between the threat and confession which results in a direct influence on the defendant's mind. There is no such showing here, nor does Detective Gilchrist's telling the defendant he didn't believe him constitute coercion. In *State v. Kornstett*, 62 Kan. 221, 61 Pac. 805 (1900), a sheriff told the suspect he believed the suspect knew who had committed the murder, and would feel better if he told the truth. There, this court stated, mere advice or an admonition to the defendant to tell the truth, which is neither a threat nor a benefit, does not render a confession inadmissible. See also *Sparf and Hansen v. United States*, 156 U.S. 51, 39 L. Ed. 343, 15 S. Ct. 273 (1895). Recognizing that coercion can be mental, as well as physical, the lies told by Detective Gilchrist do not render the statement involuntary. In *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), the questioning officer falsely told the defendant that the defendant's cousin had been brought in and confessed. The court stated that while the misrepresentation made by the police was relevant, it was insufficient to make the otherwise voluntary confession inadmissible. The court stated the case had to be decided by viewing the totality of the circumstances. 394 U.S. at 739.

Here, we cannot say that under the totality of the circumstances the defendant's confession was involuntary. The defendant was twice advised of his rights and he was provided food and coffee. The evidence fails to show the police purposefully used the "Mutt and Jeff" technique of interrogation. Detective Gilchrist was going between the two interrogations, leaving

Detective Blodgett, who had a mutual understanding with the defendant, as the primary interrogator. The questioning began at approximately 6:30 p.m. At 8:00 p.m., the defendant started giving his statement which was completed around 9:40 p.m. The defendant was not under the influence of any drugs or alcohol. There is no evidence the police made any promises of benefit to the defendant. The confession was voluntary and properly admitted at trial.

The defendant claims he is entitled to a new trial based on prosecutorial misconduct. At trial, the prosecutor asked Arthur Weiss whether, in his professional opinion, probable cause existed to arrest the defendant. The trial court sustained defendant's objections on the basis of relevancy. After that ruling, the prosecutor continued to pursue the subject.

After the defendant moved for a mistrial, the trial court denied his motion. The defendant did not request the trial court to admonish the jury to disregard the questions and the trial court did not do so on its own. The motion was focused upon irrelevant evidence and a review of the prosecutor's inquiry forms no basis for a mistrial. See *State v. Lewis*, 238 Kan. 94, 97-98, 708 P.2d 196 (1985).

Next, the defendant argues the trial court erred in allowing Dr. William Eckert to give his expert opinion on the victim's injuries. The defendant argues Dr. Eckert based his opinion on hearsay and on the opinions of another expert and, therefore, his opinion was not based on facts made known to him at the hearing as required by K.S.A. 60-456(b)(1).

Before stating his opinion, Dr. Eckert testified his opinion was based on photographs, the videotape taken at the scene of the crime, Dr. Borel's autopsy report, and a small blade, all provided to him by officers Warrington and Ramirez. A hearing was held outside the presence of the jury, where Dr. Eckert explained what information the two officers gave him. He stated they gave him the facts of the case as he was viewing the videotape, they explained where the body was found, where the road was, and circumstances indicating whether the body had been moved. Dr. Eckert was interested in how the victim and the defendant had met, and what their relationship was. The officers assumed the victim and the defendant were in the area of the pond, and had either had sex or had contemplated having sex. When asked

whether he considered that information, Dr. Eckert stated he had seen photographs of the victim's partially nude body and considered sex to be a factor in the case. However, Dr. Eckert couldn't actually say whether he took that into consideration.

K.S.A. 60-456(b) reads as follows:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

As a general rule, the qualifications of an expert witness and the admissibility of his testimony are matters to be determined by the trial court in the exercise of its discretion. *State v. Brooks*, 217 Kan. 485, 487, 536 P.2d 1365 (1975). In *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 6, 574 P.2d 136 (1977), we considered the proper basis for an expert's opinion. There, we stated:

"Where the facts and data are not perceived by or personally known by the witness, they must be supplied to the witness so that he is aware of them at the time he testifies. This may be done by having him attend throughout the trial; but it is certainly much more common, and just as proper, for counsel to provide the witness with the factual background prior to the time he expresses his opinion. The facts made known to him and upon which his opinion is based should, of course, be in evidence; as we said in *Casey v. Phillips Pipeline Co.*, [199 Kan. 538, 546, 431 P.2d 518 (1967)], 'made known' as used in K.S.A. 60-456(b) refers to facts put in evidence. Before stating his opinion, the witness may be examined concerning the data upon which the opinion is founded, if the judge so requires, and upon cross-examination the witness may be required to state the data which he has considered. K.S.A. 60-457, 458."

Here, the defendant argues Dr. Eckert's expert opinion is inadmissible because it was based upon information provided to him by the officers, the content of which was not "made known" to Dr. Eckert at trial. However, the defendant's confession had been admitted into evidence prior to Dr. Eckert's testimony. The defendant stated the victim told him she was going to perform oral sex on him, but he was impotent. The officers' "assumption" that the defendant and the victim were thinking of having sex had been put into evidence. There is no indication in the record the two officers gave Dr. Eckert anything but background information while he was viewing the videotape.

Concerning Dr. Borel's autopsy report, Dr. Eckert testified he took the report apart in order to reorganize it according to parts of

the body where injuries were located. Dr. Eckert may have relied on the facts in Dr. Borel's autopsy report, but there is no indication he relied on Dr. Borel's opinion. The facts of Dr. Borel's report, *i.e.*, the particular injuries Dr. Borel discovered during the autopsy, were testified to by Dr. Borel.

It is noteworthy that the opinions of Dr. Borel and Dr. Eckert differed on the instrumentality which caused the injuries to the anal area of the victim. Dr. Eckert testified it was a knife blade while Dr. Borel testified it was the handle of the roofing hatchet or a knife.

Finally, Dr. Eckert was handed photographs of the victim taken at the crime scene and at the autopsy. Some of those photographs had been enlarged and Dr. Eckert stated he remembered the officers providing him with regular-sized photographs. He then stated the enlarged photographs were similar to what he had been given by the officers. All of the photographs Dr. Eckert used in his testimony had been admitted into evidence.

We find the trial court did not abuse its discretion in admitting into evidence Dr. Eckert's expert testimony.

The defendant raises three issues on appeal related to the charge of aggravated criminal sodomy. The first to be considered is whether the trial court erred in denying defendant's motion for judgment of acquittal on the aggravated criminal sodomy charge made at the close of the State's case. The defendant made two arguments to the trial court: there was insufficient evidence to show a sodomy occurred, and what occurred was really a single assault which merged into the homicide.

A trial judge in passing on a motion for a judgment of acquittal must determine whether, upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or a rational trier of fact, might fairly conclude guilt beyond a reasonable doubt. *State v. Falke*, 237 Kan. 668, 683, 703 P.2d 1362 (1985). Here, the trial court properly denied defendant's motion for judgment of acquittal. Although, the defendant didn't remember using anything on the victim's rectum or anus, he stated in his confession he could have. He also stated he washed the hatchet, and the next day he dropped the hatchet near the dump. The hatchet, however, was discovered

near the river in North Topeka, along with the pillowcase which contained the victim's purse and the defendant's jacket. Human blood was found on the hatchet, although the source could not be identified.

The victim's rectum had been penetrated eight and one-half inches by a foreign object, and the injuries to the lining of the rectum were consistent with the handle of the hatchet. As to the lacerations to the skin surrounding the anus, Dr. Borel testified they could have been caused by the handle or by another object such as a knife. Dr. Eckert testified the injuries to the rectal area were more likely caused by a knife blade. Standard blades and hook-style blades were recovered from the defendant's pickup. The evidence presented by the State would lead a reasonable mind to conclude the defendant was guilty beyond a reasonable doubt of aggravated criminal sodomy.

In his motion for judgment of acquittal on the aggravated criminal sodomy charge, the defendant also argued the aggravated criminal sodomy charge was part and parcel of the homicide and therefore the charges merged. We note the defendant was convicted by the jury of premeditated murder and not felony murder.

The felony-murder doctrine was recently discussed in *State v. Brown*, 236 Kan. 800, 803, 696 P.2d 954 (1985), as follows:

"To invoke the felony murder rule there must be proof a homicide was committed in the perpetration of or an attempt to perpetrate a felony and that the collateral felony was one inherently dangerous to human life. *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983). However, the felony murder doctrine is not applicable when the other felony is an integral part of the homicide. *State v. Clark*, 204 Kan. 38, Syl. ¶ 1, 460 P.2d 586 (1969). In such a case the collateral felony is said to have merged with the homicide and results in only one offense. In order to make this determination, we have held:

" 'The proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide.' *State v. Rueckert*, 221 Kan. 727, Syl. ¶ 6, 561 P.2d 850 (1977)."

The underlying felony in the felony-murder rule must be a forcible felony, one inherently dangerous to human life. *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983); *State v. Underwood*, 228 Kan. 294, 305-06, 615 P.2d 153 (1980). K.S.A. 21-3110(8) includes aggravated sodomy in its definition describing a forcible felony. Viewing the elements of aggravated criminal sodomy in the abstract, without considering the circumstances of

the commission of the felony, we hold the felony of aggravated criminal sodomy is a felony inherently dangerous to human life and supports a felony-murder charge.

Turning to defendant's argument the aggravated criminal sodomy charge merges with the charge of felony murder, we look to see if all the elements of the felony are present in the homicide. *State v. Rueckert*, 221 Kan. 727, 561 P.2d 850 (1977).

K.S.A. 1985 Supp. 21-3501(2) defines sodomy as follows:

" 'Sodomy' means oral or anal copulation; oral or anal copulation or sexual intercourse between a person and an animal; or any penetration of the anal opening by any body part or object. Any penetration, however slight, is sufficient to constitute sodomy. 'Sodomy' does not include penetration of the anal opening by a finger or object in the course of the performance of:

"(a) Generally recognized health care practices; or

"(b) a body cavity search conducted in accordance with K.S.A. 22-2520 through 22-2524, and amendments thereto."

The defendant was charged with K.S.A. 1985 Supp. 21-3506(c)(i), (ii). K.S.A. 1985 Supp. 21-3506 sets forth the elements of the offense of aggravated criminal sodomy, as follows:

"Aggravated criminal sodomy is:

. . . . .

"(c) sodomy with a person who does not consent to the sodomy or causing a person, without the person's consent, to engage in sodomy with any person or an animal, under any of the following circumstances;

"(i) When the victim is overcome by force or fear;

"(ii) when the victim is unconscious or physically powerless."

K.S.A. 21-3401, first-degree murder, reads:

"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony."

It is clear from reading the statutes that all the elements of aggravated criminal sodomy are not present in the homicide. The charges do not merge as the defendant contends. The trial court did not err in denying defendant's motion for judgment of acquittal on the charge of aggravated criminal sodomy.

The next issue defendant raises is whether the evidence was insufficient to support the conviction of aggravated criminal sodomy. The standard of review on appeal is whether the evidence viewed in a light most favorable to the prosecution convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v.*

*Lile*, 237 Kan. 210, 699 P.2d 456 (1985). The same facts discussed previously in our ruling on the denial of defendant's motion for judgment of acquittal are relevant here and support our ruling that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The relevant elements of the offense of aggravated criminal sodomy are supported by substantial competent evidence. K.S.A. 1985 Supp. 21-3506(c)(i), (ii). The defendant admitted he could have sodomized the victim, although he didn't remember it. The defendant's intent can be inferred from all the evidence in this case. Testimony from both pathologists clearly established actual penetration, whether by a hatchet, knife, or similar object. A hatchet and some knife blades belonging to the defendant were admitted into evidence. Although it is not clear exactly when the sodomy occurred it appears from the defendant's statement that initially he and the victim were fighting back and forth in the truck and he then grabbed her feet, dragged her out of the truck, got the roofing hatchet, and hit her with it. Clearly, the victim did not give her consent and was overcome either by force or fear, or was unconscious or physically powerless at the time of the sodomy. The defendant's conviction of aggravated criminal sodomy is affirmed.

The defendant argues the trial court erred in its jury instructions. Instructions on the lesser included offenses of second-degree murder and voluntary manslaughter were given for the charge of premeditated murder. The trial court denied defendant's requested instructions on the lesser included offenses for the alternative charge of felony murder. Again, we note that after less than three hours of deliberation the jury convicted the defendant of premeditated murder and not felony murder.

When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required. *State v. Murdock*, 236 Kan. 146, 155, 689 P.2d 814 (1984); *State v. Shaffer*, 229 Kan. 310, 316, 624 P.2d 440 (1981); *State v. Foy*, 224 Kan. 558, 582 P.2d 281 (1978); *State v. Sullivan & Sullivan*, 224

Kan. 110, 578 P.2d 1108 (1978). Based on the facts previously discussed, the evidence on the charge of aggravated criminal sodomy was neither weak, inconclusive, nor conflicting. The trial court properly refused the defendant's requested instructions.

The defendant's final argument concerns his sentencing. For the crime of first-degree murder, the defendant received a life sentence. For the crime of aggravated criminal sodomy, the defendant received a maximum sentence of fifteen years to life. The trial court ruled these sentences were to run consecutively, rather than concurrently. The defendant first argues the sentences imposed constituted an abuse of discretion because the defendant lacked a prior criminal record.

The determination whether separate sentences imposed on the same day should be concurrent or consecutive is discretionary with the trial court. K.S.A. 1985 Supp. 21-4608(1); *State v. Coberly*, 233 Kan. 100, 110, 661 P.2d 383 (1983); *Burns v. State*, 215 Kan. 497, 500, 524 P.2d 737 (1974). The sentencing criteria set forth in K.S.A. 21-4606 apply to a trial court's determination of the sentence to be imposed and the sentence itself includes whether multiple terms of imprisonment are to be served consecutively or concurrently. *State v. Adkins*, 236 Kan. 259, 264, 689 P.2d 880 (1984). Upon appellate review, this court will not disturb a sentence on the ground it is excessive, provided it is within the statutory limits and within the realm of the trial court's discretion, and the sentence is not the result of partiality, prejudice, oppression or corrupt motive. *State v. Coberly*, 233 Kan. at 111. When a trial court's sentence is within the statutory limits set by the legislature, it will not be disturbed on appeal in the absence of special circumstances showing an abuse of discretion. *State v. Cunningham*, 236 Kan. 842, 847, 695 P.2d 1280 (1985).

The sentences imposed herein are within the limits set by the legislature. K.S.A. 1985 Supp. 21-4501. It is clear from the record the trial court considered the sentencing criteria pursuant to K.S.A. 21-4606, where the defendant's history of prior criminal activity is but one factor of seven to be considered at the time of sentencing. While the fact the defendant lacked a prior criminal record weighed in his favor, the other six factors considered by the trial court were unfavorable to the defendant. In imposing

consecutive sentences, the trial court stated the crime committed was depraved, senseless, brutal, and completely unprovoked. We agree this crime was of a heinous nature. The victim was brutally stabbed, beaten and sodomized. In his own statement, the defendant admitted he left her and walked to a dead-end, and when he returned to the truck she was under a tree making a "gurgling sound." He thought she was still alive, so he dragged her to the pond and "flung" her in. There is no showing the sentence is the result of partiality, prejudice or corrupt motive and, accordingly, we hold there was no abuse of discretion by the trial court in imposing consecutive sentences.

The defendant also argues the imposition of consecutive sentences constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and Section 9 of the Bill of Rights of the Kansas Constitution. The defendant asserts his punishment is disproportionate to the crimes committed.

A similar argument was asserted in *State v. Grantom*, 229 Kan. 517, 520, 625 P.2d 499 (1981), where it was noted the constitutional provisions against cruel and unusual punishment are aimed primarily at the *kind* of punishment imposed rather than its *duration*. However, this court has recognized the length of a particular sentence may be so excessive as to constitute cruel and unusual punishment. *State v. Weigel*, 228 Kan. 194, 202, 612 P.2d 636 (1980); *State v. McDaniel & Owens*, 228 Kan. 172, 185, 612 P.2d 1231 (1980). Some of the criteria to be considered in determining whether the length of a sentence is cruel and unusual punishment include excessiveness, disproportionality, lack of necessity, unacceptability to society and arbitrariness of infliction. *State v. Weigel*, 228 Kan. at 203.

We have reviewed the record and find none of the above criteria.

The judgment of the trial court is affirmed.