No. 66,274

STATE OF KANSAS, *Appellee*, v. HUNG H. NGUYEN, *Appellant*.

(833 P.2d 937)

70

Opinion filed May 22, 1992.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Rachelle Worrall Smith*, assistant district attorney, argued the cause, and *Julie Wright Connolly*, assistant district attorney, *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Hung H. Nguyen, from his convictions of two counts of felony murder and one count each of aggravated robbery, aggravated battery, and aggravated burglary.

The defendant's issues on appeal fall into four categories, which defendant contends constitute reversible error. They are: (1) failure to suppress statements the defendant made; (2) remarks the trial judge made to the jury; (3) evidence that was destroyed and

not available to the defendant; and (4) requested instructions that were not given.

Although not related, several of the people involved in this case share a common name with the defendant. In order to avoid confusion, Hung Nguyen will be referred to as the defendant and all others as indicated.

The incident from which the charges arose occurred in the early morning hours of January 18, 1987. On and prior to that date, Truong Dong To (Truong) rented an apartment and worked in Wichita. Phung Voung (Phung), Quang Nguyen (Quang), Hoat Nguyen (Hoat) and his two children, and the defendant either resided in Truong's apartment or spent time there, including occasionally spending the night.

There was evidence that all five men were present when Hoat told the group that he had heard about a Cambodian gambling party and that one of the female participants carried 5 to 10 thousand dollars in cash. According to Truong, Hoat suggested they rob the gambling party in order to have money to spend for the upcoming Vietnamese New Year celebration. Hoat and Phung continued to discuss the idea. Truong thought Hoat's suggestion was a joke, but told the others they would be better off if they found jobs. Truong was the only one who was employed.

Quang testified that the conversation was not about robbery, but about a friend of Truong's, Truong Srun, who had been beaten at a previous Cambodian gambling party at the same location. On cross-examination, Quang admitted he previously had acknowledged that a robbery had been planned, but he thought it was a joke. Quang also acknowledged that after the incident, he said that when he asked the defendant what had happened, the defendant replied, "Don't worry, just rob [sic] the gambling party."

When Hoat, Phung, Quang, and the defendant prepared to leave in the early hours of January 18, 1987, Truong noticed they had two guns. Truong first testified the defendant had given Phung a nine millimeter automatic, but then stated Hoat had given Phung the nine millimeter and showed him how to use it. Quang's testimony confirmed Truong's latter statement that Hoat had given Phung the nine millimeter gun and showed him how

to use it. According to both Truong and Quang, the defendant had a .38 revolver.

Truong testified that when he asked what they were planning to do, Phung responded, "[W]e have no money, we need money . . . . We're going to rob Cambodian people." Hoat, Phung, Quang, and the defendant left Truong's apartment between midnight and 3:00 a.m.

Kheum S. Em hosted the gambling party, attended by approximately 14 Cambodians. The guests were sitting in a circle and playing a Cambodian gambling game when there was a knock on the door. Most of the guests said the door was kicked in. Two men, who were dressed in black or dark clothing, burst in and said, "[D]on't move," in English. The guests later heard the intruders speaking in Vietnamese.

The guests thought each intruder had a gun. One of the guests stood up and attempted to grab one of the guns. Several shots were fired. Three of the guests were shot, two fatally. The intruders collected the money lying on the floor and a black purse containing over $1,000 in cash and then left.

Quang testified Phung and the defendant were the ones who went into the house. He said he remained in the car until he heard shots fired. He then ran into the house, but the defendant told him to "run out."

Truong testified that Hoat, Phung, Quang, and the defendant returned to his apartment with beer, money, and a black purse. Truong stated that the four others started counting the money and discussing the robbery. According to Truong, the defendant said he had to shoot one of the Cambodians because the Cambodian had attempted to grab Phung. Truong said Phung told him the next day they had burned the evidence.

Phung, Quang, and the defendant stayed at Truong's apartment for several days after the robbery. Eventually, only Truong and Hoat remained in the apartment.

When contacted by the police, Truong cooperated. The police recovered Hoat's nine millimeter gun used in the robbery. Hoat and Quang were arrested. Hoat was convicted of aggravated robbery and aggravated burglary. This court affirmed his conviction in an unpublished opinion. *State v. Nguyen*, No. 61,569, filed December 9, 1988. Quang pled guilty to aggravated robbery.

Louisiana authorities located and arrested the defendant in Lafayette, Louisiana, for an unrelated crime in October 1989. The defendant cooperated with them in an effort to locate Phung, who also was wanted by the Louisiana authorities. The defendant told the Louisiana authorities "that he was hangin' around with a bad group of guys in Kansas and that they were involved in a robbery." Kansas authorities were notified. Detectives from Wichita, who were in Louisiana on another assignment, went to Lafayette and took a taped statement from the defendant.

Ken Talbot, of the Lafayette Parish Sheriff's Office in Louisiana, testified at the defendant's trial. Talbot stated the defendant initially said he had stayed outside during the robbery; however, the defendant later told Talbot he had gone into the house, but shot toward the ceiling. Kenneth Landwehr, one of the Wichita detectives who took the defendant's statement in Louisiana, also testified. He discussed the taped statement in which the defendant implicated himself. After Landwehr's testimony, the taped statement was played to the jury.

A jury convicted the defendant of all charges. He was sentenced to two concurrent life sentences for the felony murders and three 5-20 year terms for the other charges, to run concurrently to each other and consecutively to the life sentences.

## I. SUPPRESSION ISSUE

The defendant claims he did not voluntarily and knowingly waive his *Miranda* rights because he was not provided with an interpreter, pursuant to K.S.A. 75-4351, prior to making statements to the Louisiana and Kansas authorities. The statute provides:

"A qualified interpreter shall be appointed in the following cases for persons whose primary language is one other than English . . . :

. . . .

(e) when such person is arrested for an alleged violation of a criminal law of the state or any city ordinance. Such appointment shall be made prior to any attempt to interrogate or take a statement from such persons."

This court previously has construed K.S.A. 75-4351(e). In *State v. Garcia*, 243 Kan. 662, Syl. ¶ 9, 763 P.2d 585 (1988), we held:

"When an in-custody statement is taken in English from an accused whose primary language is not English, but who also speaks English, failure of the officers to have an interpreter in attendance pursuant to K.S.A. 75-4351(e)

does not vitiate the statement if it was freely, voluntarily, knowingly, and understandingly made with full knowledge of the *Miranda* rights."

In *State v. Zuniga*, 237 Kan. 788, 791-92, 703 P.2d 805 (1985), we held:

"The purpose behind K.S.A. 75-4351(e) is to ensure that there is clear communication between one who is in custody and the officers who are questioning him. The statute does not state a rule of evidence. Whether or not an interpreter is appointed and is present at the taking of the statement, the trial court must still determine whether an in-custody statement was freely, voluntarily and knowingly given, with knowledge of the *Miranda* rights. That determination must be based upon the totality of the circumstances. In *State v. Newfield*, 229 Kan. 347, 357, 623 P.2d 1349 (1981), we said:

'In determining the voluntariness of a confession, it is to be viewed in light of the totality of circumstances, including the following factors: (1) The duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary. *State v. Prince*, 227 Kan. 137, 144, 605 P.2d 563 (1980); *State v. Watkins*, 219 Kan. 81, 97, 547 P.2d 810 (1976); *State v. Creekmore*, 208 Kan. at 934. The burden of proving the statement was voluntary rests with the State. *State v. Kanive*, 221 Kan. at 35.' "

Our standard of review, as set forth in *State v. Zuniga*, 237 Kan. at 792, is: " 'When a trial court conducts a full . . . hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given, and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence.' "

Ken Talbot testified that although the Louisiana authorities visited with the defendant at length, the interviews took place off and on over two or three days. Additionally, the conversations included general topics, such as the defendant's family in Viet Nam. The locations of interviews varied. They were conducted at the station, in a vehicle en route to Intracoastal City, and on a boat dock. Talbot indicated the atmosphere was cordial. They wanted to make the defendant feel comfortable because their main concern at that time was locating Phung. The trial judge noted

in the record that he had an opportunity to observe the defendant with the two officers from Louisiana. The judge said, "I also got to watch his expression and all, and there was no fear. In fact, I've never seen a defendant as cordial to police officials where . . . they've had him in custody as he was with these two gentlemen."

Detectives from Wichita, who were in Louisiana on another assignment, came to Lafayette to take a taped statement from the defendant. The record is not clear how long the Wichita detectives' interrogation lasted. The taped statement is about an hour and a half long. The Wichita officers conducted the interrogation in one of the Louisiana officer's office. During the interrogation, the Wichita police officers kept the defendant in handcuffs.

The record does not address the defendant's ability or inability to communicate with the outside world. On appeal, the defendant does not allege that his communication with the outside world was restricted unduly or that he requested communication with anyone.

The presentence investigation and State Reception and Diagnostic Center reports discuss the defendant's age, background, and intellect. He was 23 years of age at the time of the interrogation. He was born and reared in Saigon, Viet Nam. He came to this country on his own in 1984. His father and sisters still live in Saigon. His mother is deceased. His only communication with his family since his move to this country has been through the mail. He told the authorities he attended nine years of school in Viet Nam. When he came to the United States, he attended the eleventh grade in California.

The defendant claims the authorities acted unfairly because of the threats or promises they made to him, because the authorities tried to invoke sympathy for the victims' families, and because they told the defendant he was hurting his girlfriend if he refused to answer questions. The Louisiana authorities promised the defendant that if he helped them find Phung, the defendant's girlfriend would be released. She subsequently was released. The defendant fails to show the unfairness of the promise and how the promise related to his statements concerning this case that were used against him during his trial. Furthermore, the prom-

ised release of his girlfriend does not rise to the level of a "collateral benefit . . . calculated to produce a confession irrespective of its truth or falsity." *State v. Kanive*, 221 Kan. 34, 38, 558 P.2d 1075 (1976).

The defendant also alleges the Wichita authorities acted unfairly in continuing the interrogation after he informed them of his difficulty with the English language. Landwehr interrogated the defendant in Louisiana and stated the Wichita officers advised the defendant of his rights and handed him a copy of the standard rights form provided by the Wichita Police Department. Landwehr testified that when he asked the defendant if he understood English, the defendant said, "to some extent." According to the record, the defendant told the officers that he understood English "little bit." When asked if he could read English, the defendant said, "I can't read it very good."

Landwehr stated he then handed a copy of the rights form to the defendant. Landwehr read the rights form to the defendant, stopping after each right to ask him if he understood. Landwehr testified that the defendant said he understood and wanted to cooperate with the authorities and that the defendant then initialed the appropriate boxes on the form.

The tape and transcript of the tape confirm that Landwehr read the defendant his rights. As Landwehr testified, after each right was read, the defendant responded affirmatively when asked if he understood. The defendant told the officer he wanted to help and initialized the rights form. The Wichita detectives proceeded to ask the defendant questions.

Prior to ruling on the defendant's motion to suppress his confession and prior to listening to the tape of the confession and reading the transcript, the trial judge made the following observations:

"The record should reflect that the Court observed the defendant all through this hearing. That an interpreter has been here all during this hearing. . . . I have observed that the defendant impressed this Court to the viewpoint that he understood English. That he made very little use of the interpreter. . . . I said to both counsel before . . . in the chambers area, that I felt I owed it to the defendant to look at the tape before making any decision as to whether or not it was freely and voluntarily made. And also to whether or not he understood the Miranda warning."

The next morning the trial judge denied the defendant's motion, reasoning:

"I listened to the tape. . . . I had some concern in reading the transcript till I got to the last pause. There was—there was never in my mind any thoughts that there was threat or promise but I did have some slight concern . . . that maybe the defendant didn't understand.

". . . When I got towards the end of the transcript the defendant became more at ease; and, in using the approach of letting him tell more directly rather than [answering] questions, I came to an absolute opinion that he understood the questions that had been asked before.

"As I stated yesterday in the record, I observed the defendant all during this trial. . . .

"I think primarily to protect himself and his client, had a[n] interpreter who sat beside the defendant. . . . In this case, throughout this hearing, the Court never observed any need for the interpreter to assist the defendant's understanding. In fact, when we had the two gentlemen that had been brought back from the institutions, the Court even observed the defendant offering—with the Court saying, no, he couldn't—to help in the interpretation of what was being said in—in English to the Vietnamese witness who was on the stand.

. . . .

"I think . . . the Miranda warning was given and given in a proper fashion. There was no threats. . . . [T]he defendant continually said plainly and clearly that he wanted to cooperate."

There is no doubt the defendant was read his *Miranda* rights. The tape and transcript confirm the officers did not merely ask questions that the defendant could answer with a yes or no. They asked open-ended questions. The defendant's answers early in the interrogation did not always correspond with the questions asked. The last part of the taped interrogation showed a marked improvement, as the trial judge noted. It appears that when the defendant decided to cooperate, he had no trouble understanding and communicating.

The trial court had an opportunity to see and hear the witnesses and to observe the defendant. We are unable to say the trial judge erred in finding the defendant's statements were made freely, voluntarily, knowingly, and understandingly.

## II. JUDGE'S COMMENTS

The defendant contends the trial court's statements before the jury of the defendant's right to appeal constitutes judicial mis-

conduct, warranting the granting of a new trial. He specifically complains of the following remarks to the jury:

"I explained to you that if I get a question, and that will be through my bailiff, Ms. Mies, the foreman will write it down and date it. And I would request also that he write the time—he or she write the time on there. That question will be preserved, 'cause defense, regardless, would have a right to appeal. As I told you, that a judge is under a microscope and that be sure that any defendant receives the correct legal decisions. I can be challenged. And I welcome the challenges."

Defense counsel requested a mistrial, which the trial court overruled.

On appeal, the defendant maintains the trial court's comments to the jury denied him "a fair and impartial jury and trial." He argues that the judge's remarks lessened the jury's sense of responsibility in the correctness of its decision and the jury's belief in the importance of its decision. The defendant speculates that the judge's comments might have given the jurors the impression that a mistake in their findings of fact also would be correctable by appeal. Finally, the defendant contends the court's reference to the defendant's right to appeal created the impression the court believed he was guilty.

In *State v. Hamilton*, 240 Kan. 539, 546, 731 P.2d 863 (1987), this court quoted with approval the Court of Appeals' discussion of judicial conduct and appellate review standards in *State v. Stoops*, 4 Kan. App. 2d 130, 132, 603 P.2d 221 (1979):

" ' "The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, he should do so in a firm, dignified and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues."

" 'Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct; and in order to warrant or require the granting of a new trial it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. *State v. Thomson*, 188 Kan. 171, 174, 360

P.2d 871 (1961). In a more recent case, *Plains Transport of Kansas, Inc. v. Baldwin*, 217 Kan. 2, 10, 535 P.2d 865 (1975), the Kansas Supreme Court stated:

" 'We enter our caveat that no comment or remark should be made by a judge, during the trial of an action, which may tend to excite prejudice or hostility in the minds of the jurors toward one of the party-ligitants, or sympathy for the other, but a mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment, and, where a construction can properly and reasonably be given to a remark which will render it unobjectionable, it will not be regarded as prejudicial. [Citations omitted.]' "

The trial judge's comments were made after closing arguments as the jury was preparing to retire to the jury room for deliberations. The trial judge was referring to an orientation talk he gave the jury prior to trial in which he apparently explained nuances that occur at trial. (No record is before us concerning the orientation, and no complaints are made concerning the orientation.) The trial judge was attempting to explain the time-consuming process of jury questions and readbacks.

A trial court should not mention a defendant's right to appeal. Any such reference invites a defendant to appeal whether the remark was prejudicial. Here, the defendant only alleges the possibility of prejudice. His arguments concerning the possibility of prejudice are weak and do not convince us the remarks prejudiced his rights.

### III. LOST OR DESTROYED PHYSICAL EVIDENCE

The evidence in question consisted of a nine millimeter pistol, bullet slugs, and shell casings seized by law enforcement officers at the scene of the shooting and a bullet slug taken from the body of one of the victims. The evidence in question was used to convict Hoat in April 1987. The trial court retained custody of the evidence, pending Hoat's appeal. This court affirmed Hoat's conviction in an unpublished opinion in December 1988. The trial judge for Hoat's case put the evidence in storage because he was moving to a different office. A decision was made to dispose of evidence no longer in use. Except for a bullet discussed in the next paragraph, the evidence in question was disposed of during that process.

The State maintains the bullet taken from the body of one of the victims never made it into evidence because it was destroyed

in an autoclave while being sterilized. The bullet was sterilized because the victim had infectious hepatitis. The defendant maintains the autoclave process could not have destroyed the bullet. Whether the State destroyed it with the other evidence or it became unavailable because of the sterilization process, the bullet is not available.

The defendant argues that the failure to preserve evidence prejudiced his defense that he had not been the one to shoot the victims because he was unable to have the evidence tested independently. His underlying claim is that his due process rights were violated.

In *State v. Carmichael*, 240 Kan. 149, 152-53, 727 P.2d 918 (1986), this court discussed the unavailability of evidence:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant.

"There are three classifications regarding suppression of evidence: (1) where there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative value and which could not have escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that the defense could have put the evidence to significant use. [Citation omitted.]

. . . .

"Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. . . .

"The question then is whether the defendant was materially prejudiced by the unavailability of the evidence. . . .

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This

means that the omission must be evaluated in the context of the record. *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976)."

Here, the suppression of evidence must fall within the third category listed above, which this court has referred to as the "oversight" classification. See *State v. Pearson*, 234 Kan. 906, 911-12, 678 P.2d 605 (1984).

If the suppression of evidence is an oversight, as here, a defendant is granted a new trial only if the record establishes "(1) that evidence is withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial. [Citation omitted.]" *Pearson*, 234 Kan. at 916.

The defendant argues the evidence was material because it was used in the prosecution of a companion case against Hoat that arose out of the same incident. He also claims that his defense was prejudiced because he was unable to run independent analyses of the evidence that might have resulted in different findings. The defendant suggests that "[u]nder such circumstances, it is unfair to claim that [he] has not shown that the evidence would be exculpatory or to his benefit, because the action of the government, in destroying or misplacing the evidence, has conclusively prevented him from making such a showing." In support, the defendant cites cases from other jurisdictions.

The defendant, however, fails to discuss *State v. Pearson*, in which this court addressed and disposed of a similar argument. In *Pearson*, the State's testing consumed all of the material, and it was the material destroyed that Pearson was charged with criminally possessing. The *Pearson* court stated:

"In the absence of fraud or bad faith on the part of the State and its investigative agents, due process does not require the State to invite the accused to participate in or supervise testing procedures performed in the investigation of a crime, even where the amount of evidence to be tested is so small sufficient material will not remain to allow the defendant to conduct an independent analysis of the evidence. The defendant's due process rights are sufficiently protected by the opportunity to challenge the credibility of the State's expert and validity of the testing procedures used through cross-examination or expert testimony." 234 Kan. at 916.

Here, the defendant had the opportunity to challenge the credibility of the State's experts and the validity of the testing procedures used by cross-examining the expert witness.

Additionally, the evidence does not support the defendant's claim that he did not shoot any of the victims. Although no reliable evidence exists concerning the number of shots fired, three people were shot, one of them twice. Therefore, at least four shots were fired. On the night the crimes were committed, the law enforcement officers recovered two nine millimeter Lugar cartridge cases, one lead bullet, and one copper-jacketed bullet. A bullet was later removed from a victim. A bullet slug was recovered from Kheum S. Em's residence a couple of weeks later. All the evidence was that Phung had the nine millimeter automatic, which would eject cartridge cases, and that the defendant had the .38 revolver, which when fired would not eject the spent cartridge case. The evidence supports a finding that at least two of the defendant's shots from the .38 revolver struck the victims.

The defendant also claims the evidence was material because it would have bolstered his defense that he had no intent to rob and was not aware his companions had any intent to rob. His argument is he was prejudiced because he was prevented from showing that, although he fired a weapon, he did not fire the shots that killed or wounded the victims. He fails to take into account that, under felony murder, with which he was charged, who pulled the trigger is immaterial. See *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 (1980).

In denying the defendant's motion to dismiss based on the unavailability of evidence, the trial court stated that if the evidence was of such a nature that it possibly would cause a jury to reach a different result, it would dismiss the case. The trial court determined that it had received no "proffer from defense to show . . . exactly how those tests could possibly change the results of this case, other than . . . maybe to attack expert testimony."

The trial court did not err in denying the defendant's motion to dismiss or in admitting the testimony regarding the evidence. If the unavailable evidence had been available, it would not have prevented the jury from finding the defendant guilty beyond a

reasonable doubt. The unavailability of the evidence did not materially prejudice the defendant's Fourteenth Amendment due process rights.

## IV. REQUESTED JURY INSTRUCTIONS
### A. Principals And Aiders Or Abettors

The defendant requested that the trial court give the following instruction, which is quoted directly from *State v. Thomas*, 239 Kan. 457, 461, 720 P.2d 1059 (1986):

"A principal in a crime must be actually or constructively present, aiding and abetting the commission of the offense. It is not necessary that one do some act at the time in order to constitute him a principal, but he must encourage its commission by acts or gestures, either before or at the time of the commission of the offense, with full knowledge of the intent of the persons who commit the offense. He must do some act that is in furtherance of the offense."

Relying upon the language in the *Thomas* case, the defendant argued to the trial court "that an aid, counsel and abet Instruction is not available to the State as it applies under the felony murder rule." The defendant also requested an instruction limiting the applicability of the aiding and abetting instruction to the non-felony-murder counts.

In *Thomas*, the defendant was convicted of felony murder and attempted aggravated robbery. Thomas filed a motion to correct his sentences to reflect that he was merely an aider and abettor in the crimes for which he was convicted in an attempt to become eligible for parole. This court affirmed the trial court's denial of the defendant's motion and discussed the relationship between a principal and an aider or abettor in a felony-murder situation, concluding:

"In felony-murder cases, the elements of malice, deliberation and premeditation which are required for murder in the first degree are deemed to be supplied by felonious conduct alone if a homicide results. To support a conviction for felony murder, all that is required is to prove that a felony was being committed, which felony was inherently dangerous to human life, and that the homicide which followed was a direct result of the commission of that felony. *State v. Underwood*, 228 Kan. 294, 302-03, 615 P.2d 153 (1980). In a felony-murder case, evidence of who the triggerman is is irrelevant and all participants are principals. *State v. Myrick & Nelms*, 228 Kan. at 416.

"Here all the participants in the attempted armed robbery of the pawnshop were equally guilty of the felony murder, regardless of who fired the fatal shot. Under the felony-murder rule, an armed principal in an aggravated robbery cannot be an aider and abettor." 239 Kan. at 461-62.

In this case, the trial court denied the defendant's requested instructions on principals and aiders or abettors. Although the trial court did not give a specific reason for denying the defendant's request, the court concluded that the current instructions were "sufficient and proper."

The defendant argues that because the jury was not limited in its application of the aider and abettor instruction, the jury could have used such a theory to find him guilty of felony murder. The defendant claims that such a result is contrary to the *Thomas* decision.

The defendant's interpretation of the *Thomas* decision is novel, but unpersuasive. The defendant contends that *Thomas* stands for the proposition that an aider and abettor cannot be convicted of felony murder. What *Thomas* stands for is that all participants, regardless of whether they could be classified as aiders or abettors or principals, are considered principals in the felony-murder context. In other words, the category of aiders and abettors is not eliminated from the felony-murder context, but is combined with principals. This interpretation is consistent with *State v. Payton*, 229 Kan. 106, Syl. ¶¶ 1, 2, 622 P.2d 651 (1981), in which this court held: "All participants in a crime are equally guilty without regard to the extent of their participation." "Any person who counsels, aids, or abets in the commission of any offense may be charged, tried, convicted, and punished in the same manner as if he were a principal." Based on the record in this case, the trial court did not err in refusing to give the requested instruction.

## B. Lesser Included Offense

The defendant contends the trial court erred in refusing to instruct on voluntary manslaughter as a lesser included offense of felony murder. The defendant argued he did not have the requisite intent to commit aggravated robbery, which was the felony underlying the felony-murder counts. Therefore, he claims he could not be convicted under the felony-murder rule. The defendant also argues that the trial court's refusal to give his requested instruction denied him his right to have the jury in-

structed on his theory of the case, which was that he was unaware robbery was the reason for the visit to the Cambodian gambling party.

In *State v. Bailey*, 247 Kan. 330, 338-39, 799 P.2d 977, *cert. denied* 114 L. Ed. 2d 108 (1990), this court reviewed the rules for instructing on lesser included offenses in felony-murder cases:

"The trial court has an affirmative duty to instruct the jury on all lesser included offenses which are supported by the evidence. [Citations omitted.] Instructions on lesser included offenses must be given even though the evidence supporting those offenses may not be strong. [Citation omitted.]

"In *State v. Strauch*, 239 Kan. 203, Syl. ¶ 7, 718 P.2d 613 (1983), we held:

'When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence that the underlying felony was committed is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required.' "

The defendant does not argue that the evidence supporting the commission of the underlying felony, aggravated robbery, was weak or inconclusive. He argues the evidence was conflicting. He claims there was evidence that he had no intent to rob and that he was not aware of his companions' intent to rob. In discussion of this issue, the defendant does not cite to the record nor discuss specific evidence to support his claims.

Our standard of review is well established:

"In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence."

"When considering the refusal of a trial court to give a specific instruction, the evidence to support such an instruction must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Wilburn*, 249 Kan. 678, Syl. ¶¶ 1, 2, 822 P.2d 609 (1991).

Here, the evidence is strong concerning the underlying felony, including testimony that the robbery was planned and the motive for it. The defendant admitted taking a gun along, kicking in the front door, and firing the weapon. Two of the five Vietnamese testified they heard the robbery being planned in advance and that, after the event, the defendant told others they had "just rob [*sic*] the gambling party."

Under the facts in the record, the trial court did not err in refusing to give an instruction on voluntary manslaughter.

Affirmed.