No. 64,971

STATE OF KANSAS, *Appellee*, v. GREGORY J. MILO, *Appellant*.

(815 P.2d 519)

Opinion filed July 12, 1991.

*Gerald R. Kuckelman,* of Garrity and Kuckelman, of Atchison, argued the cause and was on the brief for appellant.

*Gunnar A. Sundby,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Gregory J. Milo from his convictions for first-degree murder and aggravated robbery.

On appeal, Milo raises issues concerning his alleged lack of counsel during the videotaping of a lineup; comments made by the State during closing argument; the sufficiency of the evidence and whether he was denied a fair trial by the introduction of

irrelevant evidence; the racial makeup of the jury panel; and the State's use of its peremptory challenges to allegedly systematically exclude blacks.

On the evening of June 17, 1989, Nathaniel Burnett, Sr., an alleged cocaine dealer, was killed by a gunshot wound to the head during an armed robbery at his residence. James Nance, a codefendant, was convicted for his participation in the robbery and murder and his convictions were affirmed on appeal.

At trial, the State's main witness was Anita Nance, James Nance's wife. She testified, under a grant of immunity, that on the day prior to the murder, she, James, Alganette Trevillion, and a friend of Alganette's went to Atchison. They stopped at the Burnett residence and Alganette, a friend of Burnett's, went in. On the return trip to Kansas City, Alganette, apparently without realizing that a robbery was being planned, described the layout of the house and the location of Burnett's safe.

Anita testified that the following day, she, James, and Gregory Milo went to Atchison to rob Burnett. When they arrived in the afternoon, Milo went to Burnett's front door to attempt to purchase cocaine, but Burnett would not sell to Milo since he did not know him.

Anita testified that later, she drove the group back to Burnett's. She testified she remained in the car while James and Milo went inside Burnett's home. She heard a gunshot, and the two came out and they returned to Kansas City with the proceeds of the robbery.

## I. Videotaped Lineup.

At trial, Ivan Cushinberry testified that on the day of the murder, he had gone to Burnett's house in an attempt to purchase a used tire for his car. (Burnett ran a salvage yard in addition to his other enterprises.) Cushinberry testified that while he was talking to Burnett, a vehicle stopped half a block down the street and a man walked up to Burnett and asked to buy "50 cents worth." Cushinberry testified that Burnett asked the man his name, and the man asked what difference that made. Cushinberry testified that Burnett refused to sell cocaine to the man.

Cushinberry testified that he was shown a photo lineup followed by a videotaped lineup by the KBI. He was unable to identify

anyone in the photo lineup, but he picked Milo out in the videotaped lineup as the man who had walked up to Burnett's house. Cushinberry's description of the man to the KBI and his description of that man at trial were inconsistent.

Prior to trial, the defense moved to have Cushinberry's pretrial identification of Milo suppressed and argued that Cushinberry should not be allowed to identify Milo in court, as an in-court identification would be tainted.

There was no testimony at the suppression hearing. Counsel simply argued the motion. The defense claimed that Milo was picked up in Kansas City, Missouri, pursuant to a warrant issued in Kansas, based on these charges, and that Ivan Cushinberry viewed a videotaped lineup of Milo, which included seven other individuals. The defense claims that Milo had no counsel when the video was made in Kansas City, Missouri. The defense did not state the date that Milo was taken into custody, the date when the video was taken, or the date when Ivan Cushinberry viewed the video. The tape is not in the record on appeal. The defense claims that the warrant was issued on July 25, 1989.

The State claimed that Cushinberry viewed the tape on July 27, 1989. The State argued that it did not know why the Missouri police picked up Milo. The State claimed that Kansas did not send a warrant to Missouri until sometime in August. The defense conceded that no one actually knew why Milo was picked up or how he was returned to Kansas.

The procedure used at trial to decide this issue presents us with an inadequate record on appeal. An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989).

However, there is another problem with considering the issue. The defense failed to object to Cushinberry's testimony at trial about the videotaped lineup or to his in-court identification. When either a motion in limine or a motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal. *State v. Nunn*, 244 Kan. 207, 213, 768 P.2d 268 (1989). Thus, the defendant has failed to furnish a record demonstrating error and has not preserved the issue on appeal.

In any event, the trial court did not err in admitting the identification made after viewing the videotape. In *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967), the Court discussed the policy reasons behind requiring counsel to be present at in-person lineups conducted after adversary proceedings have commenced. The reasons given by the Court concerned potential abuse of the lineup by the prosecution. The Court quoted an example:

" 'In a Canadian case . . . the defendant had been picked out of a line-up of six men, of which he was the only Oriental. In other cases, a black-haired suspect was placed among a group of light-haired persons, tall suspects have been made to stand with short non-suspects, and, in a case where the perpetrator of the crime was known to be a youth, a suspect under twenty was placed in a line-up with five other persons, all of whom were forty or over.' " 388 U.S. at 233.

The Court said:

"Those participating in a lineup with the accused may often be police officers; in any event, the participants' names are rarely recorded or divulged at trial. . . . In short, the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' court-room identification." 388 U.S. at 230-32.

Then, in *United States v. Ash*, 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568 (1973), the Court held that photo lineups conducted without counsel present after adversary proceedings have been initiated do not violate the Sixth Amendment. 413 U.S. at 321. The Court said, "Since the accused himself is not present at the time of the photographic display, . . . no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his adversary." 413 U.S. at 317. The Court discussed the fact that the defendant could make equal use of the photos in the lineup, making cross-examination of identifying witnesses possible: "Although we do not suggest that equality of access to photographs removes all potential for abuse, it does remove any inequality in the adversary process itself and thereby fully satisfies the historical spirit of the Sixth Amendment's counsel guarantee." 413 U.S. at 319. This court has recognized and followed *Ash*. See *State v. Marks*, 231 Kan. 645, 650, 647 P.2d 1292 (1982).

A videotaped lineup that is preserved by the State and made available to the defense keeps a record of what the lineup participants looked like and how they behaved. Because the videotaping of such a lineup presents none of the confrontation problems as that done in an in-person lineup, a defendant does not have a Sixth Amendment right to have counsel present when a nonconfrontational videotaped lineup is made.

## II. Prosecutorial Misconduct.

During the State's closing arguments, the following occurred:

"MR. SUNDBY: . . . What are your choices?

"Well, first, the defendant has offered an alibi without any witnesses.

"They did not show up.

"MR. MEARS: Your Honor, I object to that. May we approach the bench. (The following proceedings were held at the bench between the Court and counsel:)

"MR. MEARS: I think it is improper for the County Attorney to comment upon what the defendant did not produce.

"We have no obligation to produce any evidence.

"What evidence we produced, he can comment on, but the fact we did not produce evidence is improper, and I move for a mistrial."

The trial court, after hearing considerable argument on this issue, instructed the jury as follows:

"THE COURT: Ladies and gentlemen of the jury, you are instructed at this particular time to disregard the last statement by the County Attorney as it pertains to alibi defense.

"You are not to consider anything concerning an alibi defense in your deliberations.

"That is all the further I am going to go."

The defendant had filed a notice of alibi. The opening arguments are not in the record, so it is impossible to tell the exact language defense counsel used concerning an alibi defense. The defense did comment during jury selection that it would show that Milo was not at the scene. The defense made no such attempt at trial. Milo did not testify at trial.

Resolution of this issue depends on how one interprets the prosecution's statements. On one hand, the prosecution's closing argument could be interpreted to merely be a comment that the defense, after promising to do so, failed to call an alibi witness. Courts have held such comment permissible. In *State v. Mims*, 222 Kan. 335, 337, 564 P.2d 531 (1977), the defendant testified

that, on the night of the crime, he was in the company of a number of friends and relatives; however, the defendant did not call those friends as witnesses. In closing, the prosecution noted the failure to call the friends. This court said: "The failure of a party to produce evidence which is available to him may give rise to an inference that the evidence would have been adverse to him." 222 Kan. 335, Syl. ¶ 2.

Some other jurisdictions follow the same rule. In *United States v. Santana*, 877 F.2d 709 (8th Cir. 1989), the defendant testified that he was staying with a friend out of town when the crime was committed. The prosecution argued, in closing, that this friend had not been called to testify. The court said: "We find that the prosecutor's statements were not improper. The record indicates that Santana and his attorney had information regarding Gonzales' location, yet they did not obtain testimony from him. . . . 'The prosecutor is free to comment on the failure of the defendant to call an available alibi witness.' [Citations omitted.]" 877 F.2d at 711. See also *United States v. Schultz*, 698 F.2d 365, 367 (8th Cir. 1983) (holding that such a comment does not impermissibly shift the burden of proof to the defendant).

The common thread between *Mims* and *Santana* is, however, that the defendant testified. Neither court reached the question of whether the defendant's Fifth Amendment privilege against self-incrimination was violated. The prosecutor in a criminal case may not comment upon an accused's failure to testify. *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229, *reh. denied* 381 U.S. 957 (1965); *State v. Beebe*, 244 Kan. 48, Syl. ¶ 4, 766 P.2d 158 (1988); K.S.A. 60-439.

In *U.S. v. DiCaro*, 852 F.2d 259 (7th Cir. 1988), the court was faced with a question closer to that before us. The court discussed the interplay between comments on failure to produce other alibi witnesses and the defendant's own failure to take the stand and testify, stating:

"There has been some confusion in this circuit about what types of comments impermissibly infringe on the privilege against self-incrimination. [Citation omitted.] We have recently clarified that the 'defendant's decisions about evidence other tha[n] his own testimony do not implicate the privilege, and a comment on the defendant's failure to call a witness does not tax the

exercise of the privilege.' [Citation omitted.] A prosecutor's assertion that evidence is uncontradicted is impermissible only if it is highly unlikely that anyone other than the defendant could rebut the evidence." 852 F.2d at 263.

Here, we simply cannot evaluate what the defense had originally meant to prove because the defense did not present any evidence concerning alibi. Because the defense opened the door to the prosecution's comment and because the comment could be interpreted to go to failure to present alibi witnesses other than the defendant, we do not find reversible error.

### III. Use of Peremptory Challenge.

Defendant, a black man, argues error in the exclusion of other blacks from the jury panel.

During jury selection, the prosecution used one of its peremptory challenges to strike the only black person on the panel. When the State made the strike, it stated, "That's because she knew the child who may be a witness in the case." Then, after both sides were done exercising the peremptory challenges, the defense objected:

"Your Honor, I think for the record we are going to object to the County Attorney's strike of Mrs. Winrow.

"It shows an obvious attempt by the State to exclude the only Black person in the panel, the only Black person in the array, the only Black person called into the box, to give this defendant a chance to have a jury of his peers.

"There are other people who in the voir dire indicated that they knew Mr. Burnett that he has not stricken.

"And we think it is an obvious attempt to show prejudice against this defendant and ask the court to overrule that strike."

The State replied: "It should reflect that Sharon Peltzer knew Kea Burnett. We struck her. Anna Winrow said she knew Kea. We struck her."

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the Court found that the Equal Protection Clause of the 14th Amendment to the United States Constitution forbids prosecutors from exercising peremptory challenges solely on account of race. 476 U.S. at 89.

Under *Batson*, in order to question the State's use of peremptory challenges, the defendant must make a prima facie showing of purposeful discrimination in the State's selection of the

jury. The defendant needs to show that he is a member of a cognizable group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of that group. The defendant is entitled to rely upon the fact that peremptory challenges constitute a jury selection process that permits those to discriminate who are of a mind to discriminate. The defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the jury on account of their race or group. 476 U.S. at 96.

Once the defendant has made a prima facie showing of purposeful discrimination, the burden then shifts to the State to come forward with a neutral explanation for peremptorily challenging jurors of a minority defendant's race or group. 476 U.S. at 97. Kansas adopted the *Batson* holding in *State v. Hood*, 242 Kan. 115, 744 P.2d 816 (1987).

Here, if the defense has made a prima facie case, all this court is presented with is the fact that one black person was struck. However, even assuming that a prima facie case has been made, there is still the question of whether the State asserted a neutral reason for striking the juror.

The State asserts that it struck Winrow because she knew Kea Jackson. Kea was the victim's nine-year-old stepdaughter. She was in the house at the time of the murder. She was expected to, and did, testify at trial.

The defense argues that this is not a sufficient reason. The defense argues that because other jurors with similar characteristics were not struck, the reason is invalid. In *State v. Belnavis*, 246 Kan. 309, 787 P.2d 1172 (1990), this court said, "A prosecutor's explanation fails to be racially neutral if characteristics of a person struck are present in white panel members not challenged by the State." 246 Kan. 312.

In fact, the State did strike all other jurors who knew Kea. The State struck venireman Kasl, who was the supervisor of another of Burnett's daughters. The State struck venireman Peltzer, who knew Kea. (Peltzer also knew Ivan Cushinberry, the man who was at Nathaniel's house trying to buy a tire the afternoon before the murder.)

The State also struck other jurors who knew parties closely related to the case.

Ellison was struck by the State. He knew Alganette Seymore Trevillion (who rode to Atchison the day before the murder with James and Anita and went to Nathaniel's house and described it to James and Anita and who testified at trial), Ivan Cushinberry, Anita Nance, Bobby Smith (Alganette's son, who was visited by Alganette, Anita, and James the day before the murder and who testified at trial), and Ellajean Appel (a firefighter and E.M.T., who first responded to the scene and who testified at trial).

Hooper was struck by the State. She knew Ivan Cushinberry.

Underwood was struck by the State. She knew Bobby Smith.

Some jurors, not struck by the State, did know witnesses. For instance, Pickman, who knew Ellajean Appel; Flynn, who knew Ellajean Appel; and Brewer, who knew Dr. Rider (coroner for Atchison County and who testified at trial) were not struck. But, these jurors knew witnesses who were not closely associated with the case—*i.e.*, people whose only connection with the case came from their jobs.

In short, the State treated like jurors alike—the State consistently struck jurors who knew witnesses who had a close personal connection with the case. No error is shown.

### IV. Fair Cross-section.

At trial, the defense moved to have the jury array dismissed, arguing that there was only one black person in the panel and that this was not representative of the community of Atchison. The court said:

> "We take our lists from the registration and motor vehicle license list, and we get it that way and usually we have two or three is about all we ever have up here in that respect.
>
> "And so the Court feels that he is getting what every other person that ever comes up here for trial, whether it be civil or criminal, gets in a case.
>
> "There is not anything that has been done by our fine clerk that is different from previous methods of selection.
>
> "So your motion to dismiss this panel is hereby denied."

Counsel for the State commented:

> "We would also further comment, your Honor, that there is no evidence as to what is the percentage of Blacks in the community.

"Furthermore, as the Court says, from motor vehicles, I think it is actually from driver's records, driver control, is where we get the list from, is who has driver's licenses in our community, in Atchison County.

"We believe that driver's licenses are a fair representation of a cross-section of our community.

"It also supplemented with those voter registrations, as I understand, which would then add people who maybe do not drive, but vote.

"And I believe that is a fair cross-representation of our community."

Defense counsel then went on to argue that black people constitute seven to eight percent of the population in Atchison County, although counsel did not offer evidence to prove the point or state a basis for his percentage figure. Further, there is no showing in the record of what races the jury array was composed. At voir dire, there was a discussion of the races of the venire members but no one was sure who was of what race.

At defendant's motion for a new trial, defendant apparently renewed this argument, but the motion is not in the record, so it is impossible to tell if the defense actually produced any evidence of racial composition of Atchison or the jury array.

In *State v. Jordan*, 220 Kan. 110, Syl. ¶ 3, 551 P.2d 773 (1976), the court said, "When a challenge is made to the entire jury array, systematic or purposeful exclusion of members of a particular race or group may not be presumed. Such exclusion must be established by proof."

*Jordan* is still good law. In a recent case, *United States v. Afflerbach*, 754 F.2d 866, 870 (10th Cir.), *cert. denied* 472 U.S. 1029, *reh. denied* 473 U.S. 927 (1985), the court said, "Appellants can prevail only if they show that the district's reliance on [voter] registration lists systematically excluded a distinct, cognizable class of persons from jury service."

Here, there is no proof of exclusion of racial groups. The record does not disclose the racial mix of Atchison County or of the jury array. No error is shown.

### V. Firearm.

At trial, Anita Nance testified that after the robbery and murder, as they were driving down Old Highway 73, a handgun was thrown from the car window. The morning after the murder, Mike Wagner found a .38 revolver in the middle of old Highway

73. At trial, Anita identified it as the gun James Nance had had the previous night at the robbery and murder.

A K.B.I. firearms examiner testified that the .38 caliber bullet found in Burnett's head was shot from a gun with similar characteristics to the gun found on the highway. The examiner, however, was unable to conclusively state that the bullet was shot from this handgun because in test firings the gun did not "reproduce well"—that is, it did not leave detailed and consistent markings on each bullet.

On appeal, the defense argues that because the K.B.I. examiner could not conclusively establish that the bullet fired came from the gun, it should have been excluded.

The question of whether evidence is too remote to be relevant is left to the discretion of the trial judge, whose decision will not be disturbed unless a clear abuse of discretion has been demonstrated. *State v. Griffin*, 246 Kan. 320, 326, 787 P.2d 701 (1990). Once the evidence is admitted, it is for the jury to determine its weight. 246 Kan. at 325-26.

Here, although the K.B.I. examiner was unable to positively say that the gun found on the highway had fired the bullet that killed Burnett, there is sufficient evidence for a jury to rationally connect the gun to Milo and James Nance. The trial court did not abuse its discretion in admitting the handgun into evidence.

### VI. Sufficiency of Evidence.

The defense claims there is insufficient evidence for the jury to find Milo guilty. When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

Mattie Burnett, Nathaniel's wife, testified that on the evening of June 17, 1989, two black men came to the house, robbed her husband and shot him, and then robbed her at gunpoint. Mattie was able to identify one of the men as James Nance, by his voice. She testified that she never got a good look at the other man and was unable to identify him.

Kea Jackson, Mattie's nine-year-old daughter, gave similar testimony, but she later picked Milo out of a videotaped lineup (although she was unable to pick him out of a previous photo lineup).

Anita Nance testified that on the day prior to the murder, she, James, Alganette Trevillion, and a friend of Alganette's came to Atchison and stopped at Burnett's residence. Alganette went in, and, on the return trip to Kansas City, described the layout of the house and the location of the same. Anita testified that the following day, she, James, and Milo went to Atchison to rob Burnett.

Anita testified that Milo went to Burnett's door in an attempt to purchase cocaine, but that Burnett would not let him in. Anita testified that later, they returned to Burnett's and James and Milo went inside, she heard a gunshot, the two came out with stolen property, and, on the return trip, they disposed of a gun by throwing it out the car window.

The defense, in cross-examination of Anita, suggested that her credibility was low because she had previously lied on the stand and was testifying under a grant of immunity. The defense suggested that she was a more active participant in the robbery than she claimed.

Anita's credibility was certainly suspect, and a rational jury could have disbelieved her. However, a rational jury could have believed her because there was corroborating evidence: Ivan Cushinberry testified he saw Milo come to the door the afternoon of the murder and attempt to purchase cocaine from Burnett, and Mike Wagner found a gun on the highway in an area consistent with Anita's testimony.

Certainly, there was a question for the jury, but there is sufficient evidence to convince us that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

Affirmed.