No. 69,821

STATE OF KANSAS, *Appellee*, v. LAWRENCE C. STAFFORD, *Appellant.*
(878 P.2d 820)

Opinion filed July 15, 1994.

*Stephen R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David B. Debenham*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Lawrence C. Stafford from his convictions and sentencing for two counts of first-degree

murder, one count of aggravated burglary, and one count of unlawful possession of a firearm. He was sentenced to consecutive life sentences without the possibility of parole for 40 years for the murder offenses. The other sentences were to run concurrently with each other and with the murder sentences.

The defendant raises several evidentiary issues and claims the trial court erred in replacing a juror during the sentencing phase of the trial and in imposing consecutive hard 40 sentences.

Stafford had a three-year relationship with one of the victims, Mary Workman. On January 5, 1992, someone broke into Workman's home and shot and killed her and a male friend, John King. Entry appeared to have been through a basement window, and Stafford's fingerprints were found on both the interior and exterior basement window. Stafford had conveyed to a number of people his intention to kill Workman and King, and at one time he was charged with illegally entering King's apartment after he was found hiding behind the refrigerator with a loaded shotgun in October 1991.

This is not a fact-driven case; facts will be added as necessary in discussing the issues.

## I. HEARSAY

At trial, Roy Danks, the Emergency Medical Technician who treated King at a neighbor's house where King had gone seeking help after he was shot, testified that King told him Stafford had shot both King and King's girlfriend. Danks admitted that he never heard King say that King "saw" Stafford shoot him and his girlfriend. The neighbor testified that when he discovered King on his back porch, King said that he and his girlfriend had been shot, and when the neighbor asked who shot him, King replied, "Larry Stafford."

The admissibility of Danks' testimony concerning what King told him was determined prior to trial. The State sought to admit the testimony under K.S.A. 1993 Supp. 60-460(d)(2) or (3). Stafford responded with a motion to suppress the statements King made to Danks. A hearing on both motions was held immediately before trial, and the trial court ruled that the statements were admissible pursuant to K.S.A. 1993 Supp. 60-460(d)(3).

K.S.A. 1993 Supp. 60-460(d) provides for admitting into evidence

"[a] statement which the judge finds was made (1) while the declarant was perceiving the event or condition which the statement narrates, describes or explains, (2) while the declarant was under the stress of a nervous excitement caused by such perception or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

This court has recognized that

"[t]he trial court is necessarily given considerable discretion in admitting statements under this exception. [Citations omitted.] In *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.2d 684 (1974), we held that under this provision the presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances. See also *State v. Brown*, 220 Kan. 684, 688, 556 P.2d 443 (1976)." *State v. Hobson*, 234 Kan. 133, 158, 671 P.2d 1365 (1983).

Stafford contends admitting the statements was error. He argues there was no evidence that King claimed to have actually perceived or observed Stafford commit the shootings. Further, Stafford argues there was no evidence that King's statements were made without an incentive to falsify or distort. He suggests that because King was involved in a romantic triangle with Stafford and Mary Workman, because there was evidence that Stafford had on an earlier occasion broken into King's house, and because there was evidence that Stafford had made threats against King and Workman, King could have assumed that Stafford committed the shootings without actually having seen Stafford.

Stafford failed to object at trial to the testimony of Danks that King told him Stafford shot King and King's girlfriend, although he did object prior to trial. When an unfavorable ruling on an evidentiary question is received prior to trial, a party must make a timely objection to such evidence when introduced at trial in order to preserve the issue for appeal. See *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993); *State v. Milo*, 249 Kan. 15, 18, 815 P.2d 519 (1991); *State v. Nunn*, 244 Kan. 207, Syl. ¶ 5, 768 P.2d 268 (1989). Moreover, Stafford did not object, either

before or during trial, to the admissibility of King's statements through the testimony of Workman's neighbor. Stafford's failure to timely object at trial to the testimony concerning statements King made about who shot him and his girlfriend precludes Stafford from raising this issue on appeal. In any event, consideration of the merits of this issue reveals no error.

Stafford argued to the trial court that King did not perceive Stafford commit the shootings. The trial court did not comment on this argument. Stafford points out on appeal that both witnesses testified that King did not say he actually *saw* Stafford commit the shootings. However, it is clear that King perceived the shootings. After he was shot, King was mobile and was able to transport himself to two houses seeking help. King was aware that he had been shot three times and that Workman had also been shot. The testimony was that King was alert when paramedics began treating him. It is reasonable that, when asked who shot him, King would merely reply with a name rather than include an indication that he actually saw the person shoot him. King's failure to affirmatively indicate he *saw* Stafford shoot him does not affect the fact that the statements were made after King perceived, and was himself a victim of, the shooting.

Stafford also asserts that King's statements were not made without an incentive to falsify or distort. Stafford's reliance on the evidence that Stafford had made threats to kill King and Workman is misplaced. The State points out the lack of evidence that King was aware of these threats. Further, Stafford's observation that there was evidence Stafford had broken into King's house and threatened King with a gun on a prior occasion does not necessarily show an intent to falsify or distort. King's statements were made shortly after he had been shot, near the scene of the crime. At the time he made the statements, King feared he was going to die. Nothing indicates that King may have had an incentive to falsify or distort.

The trial court's ruling on the admissibility of King's hearsay statements will be reversed only for an abuse of discretion. There is no dispute that King was unavailable as a witness by virtue of his death. See K.S.A. 60-459(g). King made the statements after

having recently perceived the shooting and while the shooting was still fresh in his mind. We find nothing inconsistent with the trial court's finding that the statements were made in good faith and with no incentive to falsify or distort. There was no abuse of discretion in permitting the witnesses to testify about King's statements that Stafford shot him and Workman.

## II. UNAVAILABLE WITNESS

Stafford next contends that the trial court erred in allowing the transcript of Cynthia Gifford's preliminary hearing testimony to be read at trial. Stafford claims that this was error because it violated his constitutional right of confrontation.

"In cases of necessity, it is generally held that the right of confrontation under the Sixth Amendment and Section 10 of the Kansas Bill of Rights is satisfied if the accused has been once confronted by the witness against him in any stage of the proceedings on the same accusation and has had an opportunity of cross-examination." *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

K.S.A. 1993 Supp. 60-460(c) permits a witness' prior testimony to be used as an exception to the hearsay rule:

"Subject to the same limitations and objections as though the declarant were testifying in person, . . . if the judge finds that the declarant is unavailable as a witness at the hearing, testimony given as a witness in another action or in a preliminary hearing or former trial in the same action, or in a deposition taken in compliance with law for use as testimony in the trial of another action, when . . . the issue is such that the adverse party on the former occasion had the right and opportunity for cross-examination with an interest and motive similar to that which the adverse party has in the action in which the testimony is offered, but the provisions of this subsection (c) shall not apply in criminal actions if it denies to the accused the right to meet the witness face to face."

"Unavailable as a witness" includes a witness who is unable to be present or to testify at the hearing because of a then-existing physical or mental illness. K.S.A. 60-459(g)(3).

"The sufficiency of proof of unavailability is a question for the trial court within its discretion and its ruling will not be disturbed unless an abuse of discretion is shown." *State v. Steward*, 219 Kan. 256, Syl. ¶ 6, 547 P.2d 773 (1976).

Cynthia Gifford testified at the preliminary hearing on March 16, 1992. She stated that Stafford was despondent and depressed

and informed her that he wanted to shoot Workman in the face to disfigure her and to shoot King in the abdominal area. Gifford indicated that Stafford made these comments several times in October and early November 1991, though she did not recall the exact dates. She related that Stafford made these comments at a time when he was taking prescription drugs, sometimes in double doses and sometimes with alcohol.

On May 18, 1992, prior to trial, the State sought to have Gifford declared an unavailable witness and to read at trial her testimony given at the preliminary hearing. Dr. Einspahr, Gifford's doctor, testified that Gifford was diagnosed on April 14, 1992, with cholangiocarcinoma of the liver, a cancer of the bile ducts. This cancer is not curable and treatment is largely ineffective. Gifford had elected not to undergo chemotherapy and instead opted for a treatment of pain control. She was receiving numerous medications, including two kinds of narcotics, a major tranquilizer, a minor tranquilizer, a muscle relaxant, and a diuretic. She was also receiving oxygen as needed. Gifford was medicated 24 hours a day.

Dr. Einspahr testified that Gifford reported experiencing auditory hallucinations as a result of the medication she was taking. These hallucinations involved mistaking "common noises in the house for human voices," for example. Dr. Einspahr admitted the possibility, though not a certainty, that Gifford would experience auditory hallucinations in court were she to testify.

Dr. Einspahr also related that Gifford was experiencing short-term memory loss. Dr. Einspahr was unsure of the extent of Gifford's memory loss or what her memory had been like prior to her diagnosis. He did, however, think that her memory lapses were at least in part due to the medication she was taking.

Dr. Einspahr opined that Gifford was unstable. He testified that she was physically able to be present in court to testify but that it would be emotionally difficult for her. He also thought that testifying would raise her level of anxiety. Dr. Einspahr further stated that Gifford would be on medication at the time she would testify in court. He did not think that it would be in Gifford's best physical well-being to testify, though he added that it would

not injure her if it were only "an hour or two visit." When asked whether it would be in her best mental well-being to testify, Dr. Einspahr stated: "From what I have seen, it's likely to make her very anxious, I think, and I think that's reversible. I mean she could be sedated [afterward] and recover from it."

The trial court ruled that Gifford's preliminary hearing testimony was admissible pursuant to K.S.A.1993 Supp. 60-460(c). The court found as follows:

"Ms. Gifford suffers from what is obviously, from the testimony, . . . a terminal illness. The Doctor testifies that her appearance here would induce a certain amount of anxiety. The—Her mental status is unstable. Doctor further testifies that anxiety could cause further instability as to her mental status. She suffers from auditory—auditory hallucinations, a loss of memory and also the doctor points out that—that her memory loss is such that it may be—she may be stimulated by comments from another person, which then cause her to recollect and so forth. Well, obviously, she's not going to have the aid of another person testifying as to prompting her and so forth to cure lapses or losses in memory.

"And Court, for all of those reasons, finds and concludes that [Ms. Gifford] is unavailable as a witness, as a matter of law and as contemplated by the statute, and would find, therefore, that the testimony adduced at the preliminary hearing is admissible for all of those reasons."

Though Stafford objected prior to trial to the State's motion to admit Gifford's preliminary hearing testimony, he failed to make a contemporaneous objection when that testimony was read at trial. Stafford's failure to object at trial precludes him from raising this issue on appeal. See *Toney*, 253 Kan. at 656; *Milo*, 249 Kan. at 18; *Nunn*, 244 Kan. 207, Syl. ¶ 5.

In any event, there was no abuse of discretion. While Gifford may have been physically able to be present to testify, she was not able to testify. She was diagnosed with terminal cancer less than two months before trial. She was taking numerous medications and was experiencing memory lapses and auditory hallucinations. The defendant was fully able, through the assistance of the same counsel who represented him at trial, to cross-examine Gifford at the preliminary hearing. The trial court did not abuse its discretion in finding that Gifford was unavailable as a witness and in permitting her preliminary hearing testimony to be read at trial.

## III. PHYSICIAN'S TESTIMONY

Stafford next argues that the State impermissibly questioned a witness concerning an issue about which the State had previously objected when that witness was questioned by defense counsel.

Dr. Teeter testified on behalf of the defendant. Stafford saw Dr. Teeter on September 12, 1991, complaining of chest pains which Stafford related to extreme emotional distress and being upset over the breakup of a relationship with his girlfriend. When defense counsel asked Dr. Teeter if Stafford described the nature of the breakup, the State objected to any testimony concerning statements that Stafford had made to Dr. Teeter as hearsay because Stafford was not available as a witness. (Stafford had not yet testified.) The trial court sustained the State's objection. Dr. Teeter then testified that he saw Stafford every couple of weeks and that he prescribed Valium. On October 22, 1991, Stafford presented himself at St. Francis Hospital complaining of suicidal ideation; he had taken 30 milligrams of Valium plus alcohol, though his prescribed dosage of Valium was only 10 milligrams. Dr. Teeter testified that Stafford was admitted to the psychiatric unit at Stormont-Vail Hospital. Dr. Teeter saw Stafford during the hospitalization.

The State inquired: "On October 22nd when you talked to him, it wasn't only the question about the depression about the breakup with his girlfriend, but he also acted agitated and homicidal at that time, didn't he?" Dr. Teeter answered: "That's what he stated to me, yes." Defense counsel objected on the same hearsay grounds the State had earlier asserted and asked that the answer be stricken. The State argued that it was an admission against interest, but the court sustained the objection and instructed the jury to disregard Dr. Teeter's response.

The defendant contends this exchange between the State and Dr. Teeter was improper and requires reversal of his conviction. He states: "There was no legitimate basis for the prosecutor to pose the question; it was asked simply to present the jury with inadmissible evidence that Mr. Stafford allegedly had told his doctor that he was homicidal." Stafford points out that it is improper for a lawyer to place an improper matter before the jury. *State*

*v. Crowley*, 220 Kan. 532, 536, 552 P.2d 971 (1976); *State v. Carson*, 216 Kan. 711, 713, 533 P.2d 1342 (1975).

The jury was instructed to disregard Dr. Teeter's response. An admonition to the jury to disregard evidence normally cures prejudice resulting from the improper submission of that evidence. See *State v. Mick*, 229 Kan. 157, Syl. ¶ 3, 621 P.2d 1006 (1981). Nothing reflects that the judge's admonition was not sufficiently curative here. Stafford suggests that even though other witnesses had previously testified about threats Stafford had made to kill Workman and King, the other witnesses indicated that Stafford was drinking and abusing prescription medication at the time he made those threats and, therefore, the jury was more likely to give credence to Dr. Teeter's testimony. We disagree. Stafford was also abusing alcohol and prescription medication at the time he made the statement to Dr. Teeter. Further, Dr. Teeter's testimony indicated a general statement made by Stafford that he was homicidal, with no indication toward whom Stafford was homicidal. The other witnesses, conversely, testified about exactly whom Stafford wanted to shoot and, in some instances, how the shooting would occur. A general statement made to a doctor is not necessarily more credible than much more specific statements made to other witnesses. The judge's admonition to the jury to disregard Dr. Teeter's response cured any error that occurred when the jury heard Dr. Teeter's response. See *State v. Hollis*, 240 Kan. 521, 535-36, 731 P.2d 260 (1987).

### IV. CONSECUTIVE HARD 40 SENTENCES

Stafford contends that the sentencing judge abused his discretion in imposing consecutive hard 40 sentences for the two counts of first-degree murder.

K.S.A. 1993 Supp. 21-4608(a) vests the sentencing judge with authority to determine whether sentences for different crimes imposed on the same day should run concurrently or consecutively. "Whether separate sentences imposed on the same day should be concurrent or consecutive is discretionary with the trial court. *State v. Strauch*, 239 Kan. 203, 219, 718 P.2d 613 (1986)." *State v. Pioletti*, 246 Kan. 49, 68, 785 P.2d 963 (1990).

"One who asserts that the court has abused its discretion bears the burden of showing such abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. Stated another way, discretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Heywood*, 245 Kan. 615, 621, 783 P.2d 890 (1989).

See *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991).

"The sentencing criteria set forth in K.S.A. 21-4606 apply to a trial court's determination of the sentence to be imposed and the sentence includes whether multiple terms of imprisonment are to be served consecutively or concurrently." *State v. Adkins*, 236 Kan. 259, 264, 689 P.2d 880 (1984). See *Pioletti*, 246 Kan. at 68; *State v. Strauch*, 239 Kan. 203, Syl. ¶ 8, 718 P.2d 613 (1986). The criteria set forth in K.S.A. 1993 Supp. 21-4606(b) include:

"(1) The defendant's history of prior criminal activity;

(2) The extent of the harm caused by the defendant's criminal conduct;

(3) Whether the defendant intended that the defendant's criminal conduct would cause or threaten serious harm;

(4) The degree of the defendant's provocation;

(5) Whether there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(6) Whether the victim of the defendant's criminal conduct induced or facilitated its commission;

(7) Whether the defendant has compensated or will compensate the victim of the defendant's criminal conduct for the damage or injury that the victim sustained."

The trial judge found that the evidence in the case supported the findings made by the jury in recommending the hard 40 sentence, and he did impose the hard 40 sentence for both counts of first-degree murder. The trial judge then adopted the presentence investigation (PSI) report and thoroughly evaluated the sentencing factors set forth in 21-4606. He sentenced Stafford to consecutive terms of life imprisonment without eligibility for parole for 40 years for each first-degree murder conviction, to a concurrent sentence of 5 to 20 years' imprisonment for the aggravated burglary conviction, and to a concurrent sentence of 3 to 10 years for the unlawful possession of a firearm conviction.

Stafford contends that imposing consecutive sentences for the first-degree murder convictions was an abuse of discretion. He argues: "The court stated that consecutive sentences were imposed because there were separate crimes involving separate victims. This fact, however, was already factored into the sentencing decision. The jury's decision to recommend the hard 40 was based in part upon the fact that Mr. Stafford allegedly killed more than one person. Mr. Stafford's punishment was thus already enhanced for this reason."

Stafford's argument is inaccurate. The court thoroughly evaluated the requisite factors under 21-4606. Although the fact that Stafford killed two people was one factor in the jury's decision to recommend the hard 40 sentence, this fact was not the sole reason the trial court imposed consecutive sentences on the murder counts. Other factors recognized by the court in sentencing Stafford included: Stafford had two prior offenses, one of which was for voluntary manslaughter (the other aggravating circumstance relied upon by the jury in recommending the hard 40 sentence); Stafford intended to cause or threaten serious harm as evidenced by the fact that multiple gunshot wounds were inflicted; there was no provocation; there were no substantial grounds tending to excuse or justify the offenses; and the victims' conduct did not induce or facilitate the offenses. It was for all of these reasons that the court imposed consecutive sentences on the two counts of murder. There was no abuse of discretion in imposing consecutive sentences for the murder convictions.

Moreover, relying upon a particular aggravating circumstance in imposing consecutive sentences when that circumstance has already been relied upon in imposing the hard 40 sentence, even if that circumstance is the sole reason for imposing consecutive sentences, is not inappropriate. Stafford argues:

"The Kansas legislature has chosen to make the fact that the defendant's conduct caused the death of more than one person [an] aggravating factor to be considered in the determination of whether the 'hard 40' should be imposed. K.S.A. [1993] Supp. 21-4625(2). Because this factor is set forth as a specific statutory basis for determining whether a more onerous sentence should be imposed, the court's reliance upon the same factor to also order two 'hard 40' sentences to run consecutively constitutes impermissible multiple punishments."

He recognizes, however, that a somewhat similar argument, though not in a consecutive sentencing context, was rejected by the United States Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988). There, the defendant·was convicted of first-degree murder, an element of which under the facts of the case was that he had a specific intent to kill more than one person. This element was also relied upon by the jury in imposing the death penalty. The Supreme Court stated: "[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." 484 U.S. at 246.

The Kansas Legislature has indicated when it does not want elements of a crime also used to enhance the ·sentence for the crime involved. The legislature has provided for enhanced sentences where a defendant has had particular previous felony convictions, but at the same time it created an exception for those defendants convicted of a felony of which a prior felony conviction is a necessary element. K.S.A. 1993 Supp. 21-4504(e)(1). The new sentencing guidelines also specify that "[p]rior convictions of the present crime, regardless of number, shall not be included in the criminal history score when they are elements or enhance the severity level of the present crime of conviction." K.S.A. 1993 Supp. 21-4712. Thus, if the legislature had intended to preclude an aggravating factor relied upon by the jury in recommending the hard 40 sentence from also being relied upon by the trial judge as a factor in imposing sentence or in determining whether sentences imposed should run· concurrently or consecutively, the legislature would have so stated.

Stafford also argues that imposing consecutive sentences based on a factor relied upon in imposing a mandatory term of incarceration violates the Fifth Amendment double jeopardy protection against multiple punishments for the same offense. He states, "In *Ohio v. Johnson*, [467 U.S. 493, 499, 81 L. Ed. 2d 425, 104 S. Ct. 2536 (1984),] the United States Supreme Court noted that the double jeopardy protection against cumulative punishments 'is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature.'" Stafford's

reliance on this principle is misplaced. Stafford is not being punished more than once for the same offense. As discussed in the above paragraph, had the legislature intended to limit the factors justifying imposition of consecutive sentences to factors not relied upon in imposing a hard 40 sentence, the legislature would have done so.

The criteria set forth in K.S.A. 1993 Supp. 21-4606 are to be considered by the court both in imposing a sentence and in determining whether sentences should be served consecutively or concurrently. Nothing limits the use of the same factors both in imposing sentence and in making that sentence consecutive to another. The fact that one of the factors considered by the jury in recommending the hard 40 sentence was also one of the factors, or even the only factor, considered by the court in imposing consecutive sentences does not constitute an abuse of discretion in imposing consecutive sentences. There was no error.

## V. EXCUSING A JUROR
K.S.A. 1993 Supp. 21-4624 provides in part:

"(2) [U]pon conviction or adjudication of guilt of a defendant of murder in the first degree based upon the finding of premeditated murder, the court upon motion of the county or district attorney, shall conduct a separate sentencing proceeding to determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If any person who served on the trial jury is unable to serve on the jury for the sentencing proceeding, the court shall substitute an alternate juror who has been impaneled for the trial jury. If there are insufficient alternate jurors to replace trial jurors who are unable to serve at the sentencing proceeding, the trial judge may summon a special jury of 12 persons which shall determine the question of whether a mandatory term of imprisonment of 40 years shall be imposed. . . .

. . . .

"(5) If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 1993 Supp. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced pursuant to K.S.A. 1993 Supp. 21-4628 and amendments thereto; otherwise, the defendant shall be sentenced as provided by law. The jury, if its verdict is a unanimous recommendation of a sentence of a mandatory term of imprisonment of 40 years,

shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. *If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of imprisonment for life with eligibility for parole and shall commit the defendant to the custody of the secretary of corrections."* (Emphasis added.)

The State sought imposition of the hard 40 sentence for both murder convictions. The jury which heard the guilt determination phase of Stafford's trial continued to hear the hard 40 determination phase. The following aggravating circumstances were submitted to the jury: "That the defendant was previously convicted of a felony in which the defendant inflicted death on another"; "[t]hat the defendant knowingly or purposely killed more than one person"; and "[t]hat the victim was killed because of the victim's prospective performance of the victim's duties as a witness in a criminal proceeding."

The jury deliberated from 11:37 a.m. to 12:30 p.m. and from 1:30 p.m. to sometime before 1:55 p.m. At that time, two of the jurors requested to be excused. Judge Macnish met with both of these jurors separately, and then beginning at 1:55 p.m. each juror met with Judge Macnish, the defendant, counsel for the defendant, and counsel for the State. Juror Widner requested to be excused but after discussion agreed to continue deliberating.

Immediately after Juror Widner rejoined the jury, the parties met with Juror Tuttle and addressed her request to be excused. Juror Tuttle indicated that her emotional make-up was such that she could not continue deliberating. She stated that she was becoming physically ill. She responded affirmatively when asked if she felt that the other members were "set on one side" and she was "set on the other side," and she added that she did not feel like the jury had a choice as to the decision to make. Juror Tuttle did not think that she would be able to follow the instructions the court had given the jury, and she thought that the jury misunderstood the instructions. Juror Tuttle indicated that she thought either she or the rest of the jurors were confused about the instructions, but she did not feel that she could discuss the matter with the other jurors or that submitting a question to the

court would help. Juror Tuttle stated that in her mind she was unable to serve as a juror.

The district court concluded that Juror Tuttle was unable to serve and dismissed her. After Juror Tuttle left the room, defense counsel stated:

"For the record, I would like to voice my objection to releasing of Mrs. Tuttle. I don't think, based upon the responses to the questions that were propounded to her by both the—both Mr. Debenham and the Court and myself, that there was sufficient information to show that she was unable to serve. I think what Ms. Tuttle—based upon what—My understanding of what she said is that she didn't—did not want to serve; she had her own convictions and she may have had some questions or something of that nature but there was nothing about her appearance, to me, that indicated that she was physically unable to serve, the more so that—and moreover, that she did not want to serve. She did not want to make that difficult decision. That would be my objection."

The State responded that Juror Tuttle did appear physically distressed "and that she is—simply wouldn't make a decision even though it appears that she knows what decision has to be made in her mind, she will not make—that opinion." The trial judge stated: "I feel that she did fully understand that [she had the prerogative to not make a decision] and that—and that she simply, in her own words, was—was unable to serve, and there was an adamancy in her demeanor and her voice and her responses; and, for those reasons, Court found her to be unable to serve."

An alternate juror was then selected. The court instructed the jury: "[Y]ou may now resume your deliberations; and Ms. Tuttle is unable to continue and Ms. Heller is now a member of the jury with a full voice in discussions and a vote on the issues." The jury retired to the jury room at 2:25 p.m. At 3:15 p.m., the jury presented a question and took a break before resuming its deliberations at 3:50 p.m. At 4:33 p.m., the following question was presented: "Kathy Widner [the juror who had previously requested to be excused] does not feel she can carry out her duties in this matter and respectfully requests to be excused." Before the court responded to this communication, the jury informed the court it had reached a verdict. The jury found on both counts of murder two aggravating circumstances which outweighed any mitigating circumstances and recommended that the hard 40 sen-

tence be imposed on both counts. The jury was polled, and each juror, including Juror Widner, indicated he or she was satisfied with the verdicts.

Stafford contends that excusing Juror Tuttle was an abuse of discretion because there was not reasonable cause to excuse her. He also suggests that her comments indicate that the jury was unable to reach a unanimous decision and therefore the court should have dismissed the jury and imposed a life sentence with parole eligibility in 15 years. Moreover, Stafford argues that the trial court improperly instructed the jury after impaneling the alternate juror.

A defendant has no right to any particular juror or to the original 12 jurors who are impaneled to hear a case. *State v. Stallings*, 246 Kan. 642, Syl. ¶ 1, 792 P.2d 1013 (1990); *State v. Haislip*, 237 Kan. 461, Syl. ¶ 1, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985); *State v. Heck*, 8 Kan. App. 2d 496, 504, 661 P.2d 798 (1983). Likewise, a defendant has no right to have the same 12 jurors who determine his or her guilt also determine whether to recommend the hard 40 sentence. K.S.A. 1993 Supp. 21-4624(2).

This court has not considered the discharge of a juror from hard 40 deliberations after the deliberations have begun. No statute deals specifically with replacing a juror with an alternate juror after hard 40 deliberations have begun. However, K.S.A. 22-3412 does provide for discharging a juror and substituting an alternate juror during deliberations. Subsection (3) provides in part:

"If the alternate jurors are not discharged on final submission of the case and if any regular juror shall be discharged from jury service in any such action prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged and be subject to the same rules and regulations as though such juror had been selected as one of the original jurors."

Here, there were two alternate jurors impaneled prior to trial. They were not discharged upon final submission of the guilt determination phase of trial nor were they discharged upon final submission on the hard 40 determination phase. Nothing in K.S.A. 1993 Supp. 21-4624 *et seq.* prohibits substituting a juror during the sentencing phase after deliberations have begun. The

provision in K.S.A. 22-3412(3) for replacing a juror thus is not limited to juries determining guilt; that statute also applies to a jury determining whether to recommend the hard 40 sentence. Likewise, case law concerning substitution of a juror during the guilt determination phase applies to substitution of a juror during the hard 40 determination phase.

Stafford argues that the trial court erred in its instruction to the jury after the alternate juror was substituted. The court instructed the jury, "[Y]ou may now resume your deliberations; and Ms. Tuttle is unable to continue and Ms. Heller is now a member of the jury with a full voice in discussions and a vote on the issues." Stafford failed to object to this instruction and thus is barred from raising a claim of error on appeal. In any event, this instruction does not amount to reversible error. Stafford points out that in *Haislip*, 237 Kan. at 469, the trial court after replacing a juror instructed the jury to begin its deliberations anew; this court stated: "This instruction was necessary as a defendant has a right to a verdict reached only after full participation of all the jurors who ultimately return the verdict." After replacing a juror, the trial court should instruct the jury to begin its deliberations anew. Though the jury here was instructed to "resume" its deliberations rather than "begin anew" its deliberations, the instruction given by the trial court did inform the jury that the substitute juror was to fully participate in discussions and vote on the verdict. This instruction, while not recommended, does not amount to reversible error, particularly in light of what follows.

The trial court's excusal of Juror Tuttle is troublesome. This court has stated the standard of review of a trial court's substitution of a juror after deliberations during the guilt determination phase have begun: The decision to discharge a juror and substitute an alternate juror lies within the sound discretion of the trial court. *Stallings*, 246 Kan. 642, Syl. ¶ 1; *Haislip*, 237 Kan. 461, Syl. ¶ 3. "The defendant has a burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court." *Stallings*, 246 Kan. at 646. "Dismissing one juror and replacing that juror with an alternate is not an abuse of discretion where 'reasonable cause' exists." *Stallings*, 246 Kan. 642, Syl. ¶ 2. See *Haislip*, 237 Kan. 461, Syl. ¶ 2.

In *Stallings*, a juror was discharged because of religious convictions. The juror did not indicate his religious concerns during voir dire. Although he indicated he was the deciding vote, he also indicated that he could not make a judgment because of his religious beliefs. This court found that there was reasonable cause to discharge the juror and that the defendant had failed to show substantial prejudice; thus, there was no abuse of discretion. 246 Kan. at 647-48. In *Haislip*, a juror was excused without examination. The juror wrote a note requesting to be excused indicating that she was not the deciding vote but that she could not handle the fact that it was a murder trial. The trial court discharged the juror for incapacity, finding that she was " 'simply not up to the stress of a decision.' " 237 Kan. at 467. The defendant claimed prejudice because a hung jury might have resulted had the juror not been discharged. This court rejected that argument because the defendant had no right to the original 12 jurors impaneled. After reviewing portions of the juror's voir dire examination, this court went on to find no abuse of discretion in discharging the juror.

This case differs somewhat from prior cases in which a juror has been replaced. For a jury determining guilt, a hung jury results in the defendant being neither convicted nor acquitted; a hung jury leaves the case undecided and subject to retrial. In the hard 40 context, a hung jury is not an undecided jury. By statute (K.S.A. 1993 Supp. 21-4624[5]), a hung jury results in a sentence of imprisonment for life with eligibility for parole. Thus, to replace a juror who may cause a jury to be unable to reach a unanimous vote to recommend the hard 40 sentence is to deprive the defendant of a verdict. Our prior cases holding that a possible hung jury is insufficient to show prejudice are not applicable to hard 40 proceedings. The trial court cannot replace a juror during hard 40 sentencing deliberations unless it has reasonable cause and makes findings of a valid legal reason to excuse the juror other than the juror's reluctance to recommend the hard 40 sentence.

Here, the trial court made a finding that the juror "is at this point unable to further serve." The record and findings do not set forth an adequate reason to justify excusing the juror in this case.

Defendant's sentences are vacated, and the case is remanded for resentencing. The hard 40 sentence may not be imposed on the first-degree murder charges.